RESEARCH INSTITUTE FOR MEDICINE AND CHEMISTRY, INC., Plaintiff,

v.

WISCONSIN ALUMNI RESEARCH FOUNDATION, Defendant.

No. 85–C–1060–C.

United States District Court, W.D. Wisconsin.

Feb. 28, 1987.

As Amended March 10, 1987.

See also 647 F.Supp. 761.

John S. Skilton, Foley & Lardner, Madison, Wis., for plaintiff.

James R. Cole, Ross & Stevens, S.C., Madison, Wis., for defendant.

ORDER ON MOTION FOR PRODUCTION OF DOCUMENTS (SCHEDULE A AND SCHEDULE B DOCUMENTS)

JAMES GROH, United States Magistrate.

Pursuant to plaintiff's (RIMAC) Motion To Compel Production of Documents, defendant (WARF) has submitted some seventeen hundred pages of material for *in camera* examination and determination of the validity of defendant's claims of immunity from production on grounds of the attorney-client privilege and attorney's work product. These documents, styled Schedule A and Schedule B documents (with supplements) are found at Docket Nos. 121a, 174 and 190.[1]

Attached as Appendix I is a list of the documents which are ordered produced for examination and copying by plaintiff. The sheer number of documents submitted for ruling precludes discussion of the grounds for allowing or disallowing the claims with respect to particular documents. However, I have attempted below to outline broadly the principal considerations influencing my conclusions, the first being that both legal doctrines apply to patent applications and other patent-related legal representation. *Sperry v. Florida,* 373 U.S. 379, 383, 83 S.Ct. 1322, 1324–25,

1. A second batch of documents subsequently submitted for examination (pages 1702–4480; Docket Nos. 279, 302 and 328) is discussed below.

10 L.Ed.2d 428 (1963); *Natta v. Zletz,* 418 F.2d 633, 636 (7th Cir.1969).

I. *Claim of Attorney-Client Privilege*

The privilege protecting confidential communications between attorney and client is the oldest of the common law privileges, and has for its purpose the fostering of full and frank communication between lawyers and their clients. *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). However, in adopting the Federal Rules of Evidence, Congress declined to accept the Supreme Court's recommendation with regard to this and other suggested privileges (see Proposed Rules 501–513, 11 J. Moore, *Federal Practice* App. I, pp. I–19 ff. (1985), and instead adopted FRE 501 which rests all privileges (except to the extent they pertain to claims or defenses governed by state law) upon "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." [2]

The Court of Appeals for this circuit has recently reiterated the longstanding definition of the attorney-client privilege as originally formulated by Professor Wigmore:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.
>
> *Radiant Burners v. American Gas Association,* 320 F.2d 314, 319 (7th Cir.) *cert. denied,* 375 US 929 [84 S.Ct. 330, 11 L.Ed.2d 262] ... (1963) (quoting 8 J. Wigmore, *Evidence* § 2285 (Rev.Ed.1961)).

*United States v. Keplinger,* 776 F.2d 678, 700 (7th Cir.1985).

The expression of the rule is much easier than its application, which must be made on a document-by-document basis having in mind that the party invoking the privilege (WARF) has the burden of establishing all of the essential elements [3] and, further, that the privilege "should be strictly confined within the narrowest possible limits." *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983) The reason for these strict limitations is that the effect of the privilege is to deprive the fact finder of otherwise relevant information. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

Most of the documents I have ordered produced foundered on some derivative of one or more of the basic considerations outlined above. Thus, the simple declaration that a privilege exists not only fails to sustain the burden, but is virtually meaningless. If the document itself does not reveal the essential elements, then the party claiming the privilege must establish the specific predicate facts. Neither the existence of an attorney-client relationship nor the mere exchange of information with an attorney make out a presumptive claim. There must be a *communication* in intended *confidence* for the purposes of obtain-

2. Plaintiff suggests that the attorney-client privilege as recognized by the State of Wisconsin ought to be applied in the instant case as its unfair competition claim is based upon state law. I decline to follow this suggestion, as plaintiff's claims for declaration of patent invalidity and Sherman and Lanham Act violations are all premised on federal law, and only the federal privilege rule would apply to them. Rule 501 does not explain how separate state and federal rules are to be applied in these circumstances, but the problem was noted in the Report of the Senate Committee on the Judiciary (Reproduced at 10 Moore, *Federal Practice* § 501.02[3], pp. V–15–16). If the state and federal rules are actually different (a question the parties have not developed), it may become necessary to try the state claim separately in order that the integrity of the separate rules may be maintained.

3. It is entirely proper, of course, strictly to impose this burden on the party claiming the privilege, as the opponent is necessarily incapacitated, in most instances, to resist the claim. For this reason, documents with respect to which an inadequate, ambiguous or conclusory foundational showing was made were rejected. Included in this category were documents in which either the author or the recipient did not clearly appear.

ing an opinion on law or legal services, or relating thereto.[4]

■ By definition then, the requirement of confidentiality was not satisfied with regard to copies of published documents, documents which did nothing more than report public information, and information that was transmitted with the intent that it be revealed to third parties or published. *United States v. Lawless,* 709 F.2d at 487.

By the same token, documents which did not pertain to a lawyer's professional service were also rejected. Included in this category were a variety of documents, many of them mundane, that had no conceivable bearing on any law-related topic. It also includes documents addressed to business considerations and judgments. RIMAC argues that "technical matter" communicated to or from a patent attorney ought also be excluded from the privilege. While that view enjoys support in some quarters, I cannot reconcile such a restriction with the broader policy unqualifiedly expressed in *Natta v. Zletz,* 418 F.2d at 636. Moreover, since "technical matter" is an indispensable ingredient of patent law practice, the privilege would be largely meaningless if such matter could not be a proper subject of a confidential communication.

■ This introduces a point of further dispute between the parties. Most of the documents as to which privilege was claimed were to or from Howard Bremmer, WARF's inside patent counsel. While I agree with RIMAC that careful scrutiny is required to assure that house counsel's law degree and office are not used to create a "privileged sanctuary for corporate records," *Handgards, Inc. v. Johnson & Johnson,* 69 F.R.D. 451, 454 (N.D.Cal. 1975), the applicability of the privilege to qualified communications between inside counsel and management, and with the corporation's outside attorneys, is well established and must be respected. *Natta v. Zletz,* 418 F.2d at 637.[5] However, when he steps out of his role as legal advisor there is no privilege.

WARF also claims the privilege with respect to a substantial number of documents passing between WARF (particularly Bremmer) and certain licensees on the theory that a "community of interest" existed between them. This exception appears to be an application of the rule which permits co-defendants and their lawyers to exchange information without forfeiture of the privilege. See *United States v. McPartlin,* 595 F.2d 1321 (7th Cir.1979).

Perhaps the most extensive and frequently cited discussion of the community of interest rule is found in *Duplan Corporation v. Deering Milliken, Inc.* 397 F.Supp. 1146, 1172–75 (S.C.1975). There the court held that for the rule to apply there must exist either a duty on the part of one "client" to the other, or a direct transaction between the two clients which necessitates the services of an attorney who serves both parties, the key consideration being that the nature of the common interest is identical and legal. *Duplan* at 1175, 1185; *Weil Ceramics and Glass, Inc. v. Work,* 110 F.R.D. 500, 503 (E.D.N.Y. 1986). WARF's claim is grounded upon the assertion that

> as owner of the patent, WARF is under a duty to its licensees to defend the validity of the patent. WARF and its licensees have a common and identical legal interest in the validity of the licensed patents of WARF.

(WARF Br., p. 13 (Dkt. # 123))

I will note at the outset that it would not have been inappropriate to reject WARF's contention out of hand for want of any apparent effort to make out a factual case in support of its claim. It has not, for example, submitted a single license agree-

4. It also bears repeating that the privilege applies only to the *communication* itself, not to facts or to particular documents. *Upjohn Co. v. United States,* 449 U.S. at 395, 101 S.Ct. at 685. Non-privileged portions of a multiple-subject document are not exempt from production.

5. No objection having been noted, I have recognized the privileged nature of WARF's confidential communications with its British patent agent, Mr. Ellis-Jones.

ment to support its contention, nor, with rare exception, has it identified the particular patents or applications to which either the allegedly privileged documents or the underlying transactions or controversies have reference.[6] By and large, WARF has simply rested upon the conclusory assertion of a "community of interest." That is inadequate. *Byrnes v. Jetnet Corp.*, 111 F.R.D. 68, 71 (M.D.N.C.1986) This aspect of the document review, in particular, has been made more difficult by the fact that the material (which covers a period of 12 to 15 years and a variety of subjects) has been submitted without any discernible regard for chronological or subject matter order. I appreciate that WARF's task in that regard was not an easy one, but that does not diminish its burden of proof.

It is not necessary, however, to rest my conclusions upon the deficiencies of WARF's submission alone. Plaintiff RIMAC did submit a copy of WARF's license agreement with one of the licensees, Chugai, a Japanese pharmaceutical company.[7] I am convinced from my examination of that license, and other documents submitted for *in camera* examination, and by RIMAC, that WARF undertook no duty to defend the validity of the licensed patents. To the contrary, it appears to have disclaimed such an obligation. The license states (at page 6):

> c. This license is not to be construed as a warranty, either express or implied that Products, Processes or Uses or the practice of any of them are free from third-party patent infringement considerations.

That paragraph also goes on to state that the licensee may deduct from the royalties payable to WARF a portion of the royalties paid to third parties if it becomes necessary to obtain licenses from such third parties to practice the WARF patents.[8]

Similarly, Mr. Bremmer wrote to Hoffman LaRoche on March 8, 1977, disclaiming any obligations with regard to third-party patent infringement considerations.

> As a matter of policy in line with Article 3.c. we have not and do not indemnify any licensee against possible third-party patent infringement considerations. We have no control over what the licensee may or may not do ancillary to operations under a licensing agreement and, absent such control, we would be ill advised to provide such indemnification. We believe that a request for such indemnity is equivalent to a request for an unlimited insurance policy against that type of potential liability. The premium attachable to such an arrangement, if acceptable, in the form of guaranteed monies or royalty percentages, would, obviously, have to be so inordinately high as to probably foreclose a licensing arrangement. (Document Nos. 1115–1116)

Neither does the license impose upon Chugai any duty to defend (or to assist or cooperate in the defense of) WARF's patents or to aid in the attack upon competing patents.

The absence of any such obligations is consistent with the character of the Agreement, and reveals the flaw in any suggestion that WARF and the licensees had common and identical legal interests in the

6. For example, the Chugai license discussed below involved 89 patents (or applications) in a dozen countries. How or to what extent those patents (and Chugai's interests) were involved in or affected by the global patent warfare was never explained. As regards Teva and Hoffman LaRoche, scarcely any information was provided regarding the patents licensed.

7. The agreement, dated November 1, 1975, is an exhibit to the affidavit of Charles Curtis (Dkt. # 73). Of the other licensees as to whom WARF has asserted the claim of privilege, the most notable are Leo Pharmaceuticals (Denmark), Teva (Israel), and Hoffman LaRoche (Switzerland). As WARF has made no attempt to distinguish the terms of its various license agreements, I have assumed that the operative provisions of these other licenses are substantially the same as Chugai's with respect to relevant matters.

8. It appears that on one occasion the attempted invocation of this provision by Leo Pharmaceuticals provoked a controversy. I mention this to illuminate the fact that the licenses were all arms-length agreements between unrelated parties, each having in mind its own commercial gain. This example reveals the adversarial dimension of the relationships.

validity of the patents. The agreement grants only a non-exclusive license to Chugai. Thus, as plaintiff forcefully points out (Brief pp. 21–23 (Dkt. # 187)), the only thing the license grants to Chugai is the right to be free from claims of patent infringement by WARF. If the WARF patent is held invalid, the licensee need no longer be concerned about a claim of patent infringement by WARF and would be relieved of its royalty obligation.[9] While a licensee may well have had an interest, for business reasons and convenience, in the continued validity of a WARF patent (as against a competing patent) that interest was quite different from WARF's. WARF's interest was the monopoly afforded by the patent. Unlike an exclusive licensee, who exercises the monopoly power to exclude competition within the stipulated area, WARF's licensees could only practice the patent rights in competition with as many other licensees as WARF might appoint. The risk of loss, then, (or the prospect of gain) presented by a challenge to the validity of a WARF patent or application (or by an attack upon a competing patent or application) was substantially disparate in terms of legal effect.[10]

■ On the facts before me I conclude that WARF's claim of privilege with regard to communications with the licensees cannot be accepted.[11] This conclusion is supported by the general admonition that the privilege be narrowly construed, and is consistent with the results in what I consider to be well-reasoned cases. It does not appear that any of the licensees here were themselves party to any suit or other proceeding regarding the validity of any WARF patent, nor were they otherwise related so as to show an identical legal interest in the outcome of any litigation. (See *Weil Ceramics & Glass, Inc. v. Work,* 110 F.R.D. 500, 503 (acknowledging a community of interest in related corporations having a common parent). In *Duplan,* 397 F.Supp. at 1175–77, the court recognized the "community of interest" exception in this context only as to (1) parties to the litigation, (2) persons to whom a duty to defend was owed, and (3) exclusive licensees having common legal interests. I find nothing in that decision which would warrant the extension of the privilege to WARF and its licensees.

■ WARF contends also, on like grounds, that the privilege extends to communications with the inventors of the patents in suit.[12] With the exception noted below, this contention is well-founded. In the instruments by which the inventions were assigned to WARF, WARF undertook to procure the patents and share the royalties and fees they produced. The inventors, for their part, agreed to cooperate in the prosecution of patent applications and any litigation involving the issued patents. These undertakings clearly contemplate the joint pursuit of legal advice and services with regard to obtaining and defending the patents. As the inventors share proportionately with WARF in the fruits of the patents it is clear that in the performance of the agreement a community of interest exists. This includes collaboration in opposition to competing patents, since WARF and the inventors have common and identi-

9. The agreement expressly provides that Chugai's obligation to pay royalties to WARF extends only to those listed patents not abandoned or disclaimed by WARF or those not held invalid, unpatentable or unenforceable by a final adjudication. (Agreement, Para. 3(d), page 8) As plaintiff further observes (Brief p. 23 (Dkt. # 187)) the licensee itself may challenge the validity of the licensed patents. See *Lear v. Adkins,* 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969).

10. I should note here that the community of interest question is moot insofar as the filing of an opposition to RIMAC's Japanese application is concerned, as Mr. Bremmer testified that WARF had no direct or indirect involvement in those proceedings. (Ex. F to Kopp Affidavit (Dkt. # 146))

11. The absence of common and identical interests is even more sharply drawn in the case of Leo Pharmaceuticals, which also has taken licenses from RIMAC in an apparent effort to protect its own position.

12. They are Hector DeLuca, Heinrich Schnoes, Michael Holick and Erich Semmler.

cal legal interests in averting possible diminution of their patent monopoly.

Erich Semmler, however, chose not to cooperate with WARF when called upon to do so with regard to WARF's British application. At that point his position became one of an adversary to WARF. Needless to say the recognition of the privilege under this exception does assume the putative client's willingness to be a part of the community. Without Semmler's consent to be a "client" there could have been no expectation of confidentiality with regard to communications to and from him, and those communications are not privileged and are to be produced.

RIMAC has urged that the privilege should be denied with respect to certain documents which "contain information relating to the operative facts or issues in the case." (Brief p. 13 (Dkt. # 184)) This contention cannot be sustained. A communication does not lose its privileged character simply because of its content. The privilege is waived, however, when the party claiming it puts the *fact of the communication* in issue. That is what occurred in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash. 1975) upon which RIMAC relies. The defendant's "good faith" defense was that he had acted on the (otherwise confidential) advice of counsel. The assertion of that defense necessarily formed the waiver of the privilege as to all matters pertaining to that advice. No comparable issue has been raised in the instant case.

Plaintiff further claims that WARF practiced fraud in the prosecution of domestic and foreign patent applications, and that the claim of attorney-client privilege must be denied insofar as the communications pertain to those applications. Fraud on the Patent Office is a well-settled exception to the attorney-client privilege. *Natta v. Zletz,* 418 F.2d 633, 636 (7th Cir. 1969) However, a *prima facie* showing of fraud must be made out before the exception may be invoked. While I agree that evidence of the fraud may be derived from the privileged communications themselves (*Duplan Corporation v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1194 (S.C.1975) it would be of dubious propriety to consider so grave a charge without requiring a preliminary showing of the factual basis for plaintiff's fraud claims and giving WARF an opportunity to respond. RIMAC has indicated its intention and readiness to make a separate application, and I will defer ruling on that issue at this time.

II. *Claim of Work Product*

Since its articulation by the Supreme Court just over forty years ago in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) the work product rule has become so thoroughly integrated into the litigation and discovery process that I will forego the familiar recitation of its parameters, underlying policies, and features which distinguish it from the attorney-client privilege. The parties' briefs provide an abundance of citations to such discussions. For present purposes it is sufficient to observe that the rule shields from production (absent a strong showing of necessity, F.R.Civ.P. 26(b)(3)) materials prepared for use in existing or reasonably anticipated litigation. See *Hickman v. Taylor* at pp. 510–11, 67 S.Ct. at pp. 393–94.

The difficulties encountered in ruling on these claims were even greater than with respect to the privilege claims. Unlike the conventional situation where the production of particular materials pertaining to particular litigation is resisted on work product grounds, I was confronted here with a mass of documents and generalized claims that they constitute work product in some litigation or other without any explanation of the litigation or underlying issues. As previously stated with regard to the privilege claims, work product immunity is not established by the simple assertion of the claim and the recitation of some magic words. It is my impression that these claims were asserted with a minimum of care and discrimination. In no instance that I can recall was any meaningful explanation offered *why* a document

was thought to contain work product.[13] While the burden is, of course, upon the moving party to demonstrate its need to see work product, the burden is upon WARF in the first instance to demonstrate that a document does in fact contain attorney work product. I have, therefore, rejected the work product claim in those instances where I was unable to discern the following information which was material to the determination:

(1) that the document was a prepared in contemplationa of, or for use in, some specific litigation, as distinguished from some other purpose.

(2) the authorship of the document; this includes countless instances in which documents were described as having been prepared "by or for Mr. Bremmer," a formulation which I came to recognize as shorthand for "author unknown."

(3) when the document was prepared.

The claim was also rejected with respect to documents which did not reflect any plausible suggestion of an attorney's efforts or thought processes. This category includes published documents or information, internal corporate data and other ordinary business documents and information, documents noting publicly known current developments, and the like. In broader terms, I rejected the claims in each instance in which, after considering WARF's submission and the content of the document, I concluded there had been an inadequate, ambiguous, or speculative showing that the document was in fact work product.[14]

I was unable, in many instances, to discern the particular litigation or proceedings to which documents pertained. This takes on some importance (and may require further production by WARF) as it was not my intention to recognize any work product claim with regard to patent applications generally (except those now pending as to which oppositions have been filed). The work product rule is designed to protect the lawyer's work from his litigation adversary. Obtaining a patent is an *ex parte* proceeding, and until that proceeding acquires an adversarial gloss the work product rule has no application.

Neither does the rule have application to the work product of past, closed litigation. Unlike privileged material, which is protected until waived, the protection afforded work product is not, and need not be, permanent. When the litigation for which it was prepared is at end, the purpose of the rule has been fulfilled and the need to protect the material from disclosure no longer exists. Accordingly, it has not been my intention to recognize work product claims except with regard to the current lawsuit (or other pending litigation). See *Duplan Corporation v. Deering Milliken, Inc.*, 397 F.Supp. at page 1190.

As previously noted, some 2700 additional documents pages have been submitted for *in camera* review. As I have also previously discussed, the examination of the first 1700 pages has been complicated and prolonged by certain organizational and other deficiencies. These considerations, however, are undoubtedly less of a problem to WARF's counsel who have a greater familiarity with the facts of the case and its substantial, multi-national cast of characters.

I have determined that a substantial number of the questioned documents must be produced and I have explained above, in broad terms, the basis for those determinations. From this information, I believe that the interests of justice, the conservation of judicial energy, and the expeditious resolution of the remaining privilege/work product questions will be better served if the remaining documents (submitted under

13. Instructions would have been helpful, for example, to an understanding of the basis for the claim of work product (and attorney-client privilege) for a registered mail receipt. (Document No. 00017).

14. For the reasons expressed above, I also reject WARF's "community of interest" claim with regard to alleged work product materials shared with licensees.

Docket Nos. 279, 302 and 328) are returned to WARF for reconsideration in light of this order. WARF shall have until March 16, 1987, in which to produce for examination such additional documents as it determines to be producible.[15]

A status conference shall be held March 18, 1987, at 11:00 a.m. to consider what further action may be required with respect to the remaining documents, including, if the circumstances so indicate, the recommendation that the district judge appoint a master to conduct the *in camera* examination. See Fed.R.Civ.P. 53; *Natta v. Zletz,* 418 F.2d at 635.

ORDER

IT IS HEREBY ORDERED that:

(1) Defendant's objections to the production of the documents listed in the Appendix hereto are overruled, and defendant shall forthwith produce them for examination and copying.

(2) Defendant shall re-examine the documents hereto filed under seal under Docket Nos. 279, 302 and 328 in light of this opinion and order and shall produce for examination and copying such additional documents as it determines not to be exempt from production on or before March 16, 1987. Leave is granted defendant to withdraw the said documents from the office of the Clerk of Court for this purpose.

(3) A status conference shall be held at 11:00 a.m. on March 18, 1987, as provided in the opinion.

*APPENDIX I*

Listed below are the numbers of those documents in defendant's Schedule A, Supplemental Schedule A, Schedule B, and the First and Second Supplemental Schedules B (Doc. Nos. 1–1701) as to which the claim of attorney-client privilege or work product is denied. These documents shall be produced.

| Document Number |
|---|
| 1 |
| 2–5 |
| 8–9 |
| 10–11 |
| 12–28 |
| 29 (except 2nd and 3rd sentences of ¶ 2) |
| 30 |
| 31 (except ¶ 2) |
| 32–43 |
| 35–50 |
| 51–54 |
| 69 |
| 70–71 |
| 72–74 |
| 75–76 |
| 81–84 |
| 97–98 |
| 99–103 |
| 104–106 |
| 107–111 |
| 114 |
| 115 |
| 118–121 |
| 123–128 |
| 138–139 |
| 140 |
| 141–146 |
| 147–155 |
| 157 |
| 160 |
| 170–171 |
| 178–179 |
| 187–189 |
| 203–204 |
| 220 |
| 271 |
| 330 |
| 338–341 |
| 365 |
| 367 |
| 393–397 |
| 398–399 (except text on 399) |
| 462–464 |
| 518 |
| 567–581 |
| 582 |
| 628–629 |
| 710 |
| 719–720 (except text following ¶ 6 on 720) |
| 721 |
| 744–747 |

15. To mitigate the concerns WARF has previously expressed (Br. pp. 6–7, 19 (Dkt. # 123)) concerning inadvertent waiver of the privilege or work product immunity, WARF may wish to consider the production of such documents under an uncontested order.

| | |
|---|---|
| 752–754 | 1034 |
| 759–765 | 1035–1038 |
| 766–775 | 1039–1045 |
| 776 | 1046 |
| 777 | 1047 |
| 778 | 1048–1049 |
| 813 | 1050–1051 |
| 814–815 | 1052–1054 |
| 816 | 1055–1056 |
| 819–822 | 1057 |
| 823–824 | 1058–1065 |
| 845 | 1066–1067 |
| 846–847 | 1082–1087 |
| 848–848a | 1088 |
| 853–854 | 1089–1090 |
| 855 | 1091–1094 |
| 856–868 | 1095–1096 |
| 871–872 | 1097–1101 |
| 873–875 | 1102–1103 |
| 878–898n | 1108–1112 |
| 899–902 | 1113–1114 |
| 904–911 | 1115–1117 |
| 912–919 | 1119 |
| 920–934 | 1120–1124 |
| 935 | 1125–1126 |
| 939–942 | 1127–1128 |
| 943–953 | 1129 |
| 954–956 | 1130 |
| 957–959 | 1131–1132 |
| 960–963 | 1133 |
| 967–975 | 1134–1135 |
| 976 | 1136–1137 |
| 977–979* | 1138–1140 |
| 990 | 1141 |
| 991 | 1142 |
| 992 (except ¶ 2) | 1143 |
| 993 (except ¶ 2) | 1144 |
| 994 | 1145 |
| 995 (except ¶ 2) | 1146 |
| 996 | 1147 |
| 998 | 1148 |
| 999 (except ¶ 1) | 1149–50 |
| 1000 | 1151 |
| 1001 | 1152 |
| 1002 | 1153 |
| 1003 | 1154 |
| 1004–1005 | 1155–1156 |
| 1006–1008 | 1157–1159 |
| 1009 | 1160 |
| 1010 | 1161 |
| 1011 | 1162–1163 |
| 1012 | 1164 |
| 1013–1020 | 1165–1166 |
| 1021–1022A–C | 1167 |
| 1023 | 1168 |
| 1024 | 1169 |
| 1028–1030 | 1170–1182 |
| 1031–1033 | 1183–1185 |

* Document Nos. 1404–1405 are illegible; defendant shall submit legible copies.

1186–1187
1188
1189–1190
1191–1193
1194
1195–1204
1205–1209
1210–1212
1220–1222
1223
1224–1225
1226–1229
1230
1231–1232

*****BEGIN SCHEDULE A DOCUMENTS*****

Document Number

1235–1267
1268
1275
1279–1280
1281
1295
1298
1299
1300–1301
1304*
1424
1426
1427–1428
1429
1430–1431
1432
1434
1435
1436
1437–1439
1440–1441
1442
1443
1444–1445
1446–1447

1461
1464–1465
1467–1468
1487
1491
1492
1497–1498
1505
1506–1507

1510
1511–1512
1513–1514
1518–1519
1544
1552
1555–1556
1570–1571
1572
1573
1574–1575
1587–1591
1593
1596–1597
1598–1600

*****BEGIN SUPPLEMENTAL SCHEDULE A DOCUMENTS*****

Document Number
1602–1603
1608
1621–
1647–1648
1649–1656
1657–1658
1659–1660
1661–1662
1663–1664

*****BEGIN FIRST AND SECOND SUPPLEMENTAL SCHEDULE B DOCUMENTS*****
1692–1700
1701