Nos. 84,573
84,974

STATE OF KANSAS *ex rel.* CARLA J. STOVALL, *Appellee,*
v. DAVID R. MENELEY, *Appellant.*

(22 P.3d 124)

Opinion filed April 27, 2001.

*Margie J. Phelps*, of Topeka, argued the cause, and *Jonathan B. Phelps*, of Phelps-Chartered, of Topeka, was with her on the brief for appellant.

*M. J. Willoughby,* assistant attorney general, argued the cause, and *John R. Dowell,* assistant attorney general, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a quo warranto action to oust the defendant, David R. Meneley, from the office of Sheriff of Shawnee County, Kansas. The case was heard by two trial judges who found the State had sustained its burden of proof on 3 of 13 counts and entered an order of ouster from office. This court has jurisdiction pursuant to Supreme Court Rule 8.02 (2000 Kan. Ct. R. Annot. 55) (transferred to Supreme Court on motion) and K.S.A. 20-3016(a)(2), (3), and (4). Meneley raises 14 issues on appeal.

The trial judges unanimously found, by clear and convincing evidence, that Meneley committed willful misconduct, as contemplated in K.S.A. 60-1205(1), in that he knowingly and willfully concealed evidence of Deputy Timothy Oblander's theft of drug evidence from the sheriff's office, he willfully gave false testimony under oath at an Attorney General's inquisition by denying his knowledge of Oblander's illegal drug use and treatment for drug addiction, and he willfully gave false testimony under oath in the Shawnee County District Court by denying that he had any knowledge regarding Oblander's illegal drug use and treatment for drug addiction.

In November 1992, Meneley was elected Sheriff of Shawnee County, Kansas. Meneley was elected a second time in November 1996, and continued in office until the ouster order at issue here.

In 1993, Meneley created a special services unit, which, in addition to investigating burglaries, provided manpower for surveillance support for the narcotics unit. Oblander and Scott Baker were original members assigned to the special services unit that included a K-9 program, which was Oblander's original assignment in the unit. Between January 1993 and May 1994, the Shawnee County Sheriff's office narcotics unit included Detective Daniel Jaramillo, Detective Scott Holladay, and Deputy Phil Blume. Captain Roger Lovelace was the division commander of both the special services unit and narcotics unit.

In late 1993 or early 1994, Oblander started consuming small amounts of cocaine and methamphetamine, taking the drugs from the evidence packets used to train his dog. Drug evidence was checked out to Oblander, as a K-9 officer, for months at a time. He carried the drugs with him daily. The drugs were weighed when they were checked in or out. On two occasions, there was a weight discrepancy in the drugs. These discrepancies were supposed to be noted on reports signed by the property room officer and Oblander, but nothing was ever done to resolve the discrepancies.

In late 1994 or early 1995, Oblander began making drug buys on the street. Oblander occasionally consumed some of the drugs that he purchased on the street. Oblander testified that he never used the drugs in the presence of anyone else, not even his partner, Frank Good, nor did he tell anyone about his drug use.

In May or June 1994, Jaramillo and Blume were assigned to the FBI Federal Drug Task Force, a multi-jurisdictional task force engaged in undercover narcotics operations. During their time with the task force, Jaramillo and Blume would report back to the sheriff's office to provide information and update Meneley regarding their activities. Jaramillo and Blume met with Meneley in November 1994, February 1995, and July 1995.

In late July 1994, Officer J.D. Sparkman retrieved a bag of evidence from the drug evidence locker located at the sheriff's office in the basement of the Shawnee County Courthouse. The evidence was from the *Caldwell* case which involved state and federal drug charges. After weighing the evidence, Sparkman determined that some of the cocaine evidence was missing. The officer assigned to the *Caldwell* case was Holladay. Holladay had checked out the evidence on June 22, 1994, for use in federal court proceedings which ended in a judgment of acquittal for Caldwell. After returning from federal court on July 5, 1994, Holladay held the *Caldwell* cocaine evidence in his desk until July 15, 1994, and eventually put the drugs in the evidence locker. An earlier related state court proceeding had ended in a plea in January 1992. Thus, by the time Sparkman retrieved the drugs from the evidence locker, all litigation concerning the drug evidence had been concluded. The *Caldwell* drugs were slated for use in the K-9 program or destruction.

Upon discovering the missing cocaine, Sparkman contacted Holladay. The missing cocaine was reported to Meneley, who ordered an internal investigation. The investigation was assigned to Detective Mike Ramirez.

During the investigation, Holladay told Ramirez that he had checked the drugs before putting them in the locker. They were all in the bag and the bag was intact.

Ramirez was unable to determine who took the cocaine from the *Caldwell* evidence. On August 15, 1994, he closed the investigation and placed it on "inactive" status.

Oblander was never questioned or investigated because there was nothing linking him to the evidence locker. On November 22, 1999, Oblander gave a detailed statement to the Shawnee County District Attorney as part of a diversion agreement to resolve perjury charges filed against him earlier in 1999. During the interview, Oblander was asked several times if he took the *Caldwell* drugs. Each time he stated that he did not.

On November 23, 1999, Oblander returned to the district attorney's office on his own volition, bringing his wife and a minister. He advised the district attorney that he had to "get something off his chest" and make peace with God. Oblander then told the district attorney that he had, in fact, taken the *Caldwell* drugs. Oblander told the district attorney that he took the drugs from Holladay's unlocked desk drawer. He tore open the brown paper bag containing all the evidence, tore a KBI seal off an inner plastic bag holding small bags of cocaine, and took three or four of the small bags. Oblander admitted that he took the cocaine before the evidence was placed in the evidence locker on July 15, 1994.

On May 12, 1995, Oblander was reported missing by his partner, Good. Good advised Meneley that he had not seen Oblander since the night before and did not know where he was. A search was made and Oblander was found that afternoon in his truck in Silver Lake, Kansas. Oblander told officers that he had had a fight with his wife and had stayed out all night. Oblander smelled like alcohol, was quiet, red-eyed, and disheveled.

Meneley directed a local health care provider to examine Oblander. Oblander was not permitted to return to work until the mental health care provider cleared him.

On May 24, 1995, the mental health care provider released Oblander back to work. In a letter, Dr. Stephen H. Blum said he had treated Oblander for "mild depression" since May 15, 1995. The letter further said: "Tim has not reported any symptoms over the past two weeks and I feel that he is ready to return to work. I have recommended that he see me on a weekly basis for now, and that he begin taking the medication as soon as possible." Based on the letter from Dr. Blum, Oblander returned to work.

On or about June 27, 1995, Oblander entered Valley Hope Treatment Center in Atchison, Kansas. Meneley, Baker, and Mickey Brokaw went to visit him at the treatment center for 45 minutes. Oblander testified that Meneley did not bring up the subject of drugs, so he did not bring it up.

When Oblander finished treatment, he returned to work at the sheriff's office. By a mutual agreement among him, his treatment counselor, and Meneley, he was reassigned from narcotics to warrants.

In January or February 1996, Jaramillo and Blume told Assistant District Attorney Tony Rues that drug evidence had been taken from the evidence locker at the sheriff's office and that Meneley was covering up the evidence misuse.

Rues reported this information to District Attorney Joan Hamilton and asked her, on behalf of Jaramillo and Blume, to notify the Attorney General's office that drugs had been taken from the evidence locker in 1994 so that an investigation could be conducted.

On February 13, 1996, Hamilton wrote a letter to Attorney General Carla Stovall asking her to investigate missing drugs in a federal case concluded in 1994.

As a result of Hamilton's letter, Stovall asked the Kansas Bureau of Investigation (KBI) to conduct an investigation. On March 25, 1996, KBI Director Larry Welch met with Meneley in his office to advise him the investigation would take place. Meneley pledged full cooperation. On or about March 26, 1996, Meneley met with KBI investigators in his office, again agreeing to cooperate in the investigation. At the conclusion of this meeting, Meneley arranged for KBI investigators to meet with Jaramillo and Blume to schedule

an interview. During the interviews, Jaramillo and Blume told investigators that Meneley had told them in July 1995 that he knew Oblander was using drugs and had stolen drugs. Eventually, the investigation turned into an inquisition conducted by Assistant Attorney General David Debenham.

During the period this investigation was occurring, additional drugs were found missing from the evidence locker at the sheriff's office. Meneley directed his staff to notify the KBI so it could include this in its investigation. Meneley also directed that an internal investigation begin.

During the inquisition, Oblander took the Fifth Amendment. Meneley testified at the inquisition on April 11, 1996. Meneley stated that he had never told Jaramillo and Blume that Oblander was using drugs. Meneley told investigators that Oblander had never told him that he had taken drugs from the evidence locker. Meneley also told investigators that Oblander had never indicated to him that he had a substance abuse problem.

On August 22, 1996, Stovall wrote a letter to Hamilton stating that the KBI's investigation had been completed and that they were unable to establish who had taken the drugs from the evidence locker in 1994. The letter did not mention any of the other drug evidence missing from the sheriff's office.

Hamilton subsequently released a letter to the local defense bar advising them of the investigation and potentially exculpatory evidence regarding the non-*Caldwell* missing drug evidence.

In February and March 1998, a Shawnee County District Court hearing was conducted in *State v. Hernandez,* on a motion to dismiss filed by Hernandez. The *Hernandez* case was based on the discovery of marijuana in Hernandez' home when an arrest warrant was served. The principal officer working the case was Holladay. During the hearing, Jaramillo and Blume testified that Meneley told them in July 1995 that he knew of Oblander's cocaine use and that Oblander was in treatment for cocaine addiction. They also testified that Oblander had admitted to Meneley that he took the *Caldwell* drugs.

Oblander also testified at the *Hernandez* hearing. At the hearing, he specifically denied that he had used cocaine or that he had been

treated at Valley Hope for cocaine use. On March 1, 1999, however, Oblander admitted in a public statement that he had been in treatment for cocaine addiction.

On March 9, 1998, Meneley testified for a second time in the *Hernandez* case. Meneley was asked: "What knowledge did you have on March the 1st of Exhibit 17 to whom it may concern that Deputy Oblander was using cocaine during the time he was in your agency?" Meneley responded: "None." Exhibit 17 was Oblander's public statement about cocaine use issued on March 1, 1999.

Meneley was also asked: "Before March the 1st, 1999, has anyone reported to you that Deputy Oblander was using drugs, controlled drugs during the time that he was a sheriff's deputy?" Meneley responded: "No, the first time I knew of it was his written statement or written whatever you would call it."

After the hearing, Judge Eric Rosen issued an order dismissing *Hernandez* because of the mishandling of drug evidence at the sheriff's office. Based on the *Hernandez* order, seven additional cases were reversed.

On May 24, 1999, a petition in quo warranto for the ouster of Meneley was filed pursuant to K.S.A. 60-1201 *et. seq.* on behalf of the State by the Attorney General. The ouster petition alleged that Meneley was the Sheriff of Shawnee County, Kansas, and that he should forfeit his office because of willful misconduct in office. The ouster trial commenced on January 18, 2000.

At the ouster trial, Jaramillo and Blume testified that Meneley told them in July 1995 that Oblander told him he was using cocaine, had stolen evidence from the *Caldwell* case, was backfilling evidence with foreign substances, and had tampered with evidence in cases.

Jaramillo and Blume testified that in July 1995, Meneley again met with Jaramillo and Blume regarding their drug activities with the task force. During the meeting, Meneley stated that he had confidential information that he wanted to discuss with them. Meneley asked Jaramillo and Blume if they had any drug evidence missing from any of their drug cases, to which they responded that they were unaware of any evidence missing from their cases. Meneley told Jaramillo and Blume that Oblander had been using drugs

during the time he was in special services, including methamphetamine and cocaine. Meneley told Jaramillo and Blume that Oblander had become addicted to cocaine and was currently in drug rehabilitation.

Jaramillo and Blume testified that Meneley had told them that Oblander had taken the cocaine evidence missing from the year before, that Meneley told them that Oblander had said that he first started using drugs in 1993 when he was first assigned to special services, and that Meneley stated that he believed Oblander's drug use started or intensified after Jaramillo and Blume went to the task force.

Jaramillo and Blume further testified that Meneley told them that Oblander had been taking drug evidence from the drugs he purchased as a narcotics officer and that Oblander had tampered with drug evidence by removing some of the drugs and replacing those drugs with other substances.

Jaramillo testified that in October 1995, he had a conversation with Holladay regarding Oblander's drug use. Jaramillo told Holiday the information he had received from Meneley during the July 1995 conversation. Between October 1995 and December 1995, Jaramillo, Blume, and Holladay discussed the information they had learned regarding Oblander's drug use, Oblander's use of drug evidence, and Oblander's drug treatment for addiction to cocaine. Jaramillo, Blume, and Holladay discussed how they should proceed in disclosing to outside agencies the information they had learned.

Assistant District Attorney Jim Welch testified that in May or June 1995, he received two phone calls from Meneley. In the first call, Meneley told Welch that Oblander had used drugs during his undercover duties and was now addicted. Meneley stated that he was trying to reach a consensus about how to handle the situation. Welch told Meneley that he should go look up the *Woodworth* case, which involved an undercover narcotics officer using drugs. A few days later, Meneley called Welch a second time and told Welch that he did not want to handle the Oblander situation that way and that he wanted to handle it as a worker's compensation issue.

Oblander also testified at the ouster trial. Oblander testified that he did not tell Meneley about his drug use in July 1995 or any other time. Oblander further testified that he did not tamper with any of the evidence in the evidence room. Oblander stated that he did not admit to anyone that he took the *Caldwell* drugs before November 23, 1999. Oblander further testified he never told Meneley that he had taken drugs from the K-9 drug packets or from the buys on the street.

Oblander testified that he wanted Meneley to believe his treatment at Valley Hope was for alcohol and not for drugs. He testified that he went to considerable effort to portray to everyone at the sheriff's office that his substance abuse problem involved alcohol only and that he had been treated for alcohol abuse. He stated that he was worried that Meneley would find out about his drug use and fire him.

Baker testified that when Meneley talked to Oblander at Valley Hope, the conversation was all about alcohol and nothing was ever said about drugs.

Neither Meneley nor Good testified at the ouster trial.

After the ouster trial concluded, the panel of judges rendered an order granting in part and denying in part the relief sought in the petition. The judges found that Meneley had knowingly and willfully concealed his knowledge of Oblander's drug thefts from the sheriff's office during the 1996 Attorney General's inquisition The court found that Meneley provided sworn testimony on April 11, 1996, that he knew nothing about Oblander's drug problems. The court also found that Meneley's testimony in the *Hernandez* case was willful and false.

In granting a part of the relief sought by the State, Meneley was ousted from his position as Shawnee County Sheriff.

## I. REFUSING TO STAY PROCEEDINGS

Meneley argues that the district court erred when it: (1) refused to stay the civil proceedings against him or grant a continuance while there were criminal perjury charges pending against him and Good; and (2) refused to provide him with immunity from subsequent criminal prosecution in the event he was to testify during

his ouster trial. Meneley asserts that the district court's error violated his Fifth Amendment right to remain silent because neither he nor Good could testify in his defense in the ouster trial without risk of incriminating themselves in the subsequent criminal trials.

As an initial matter, we note that Meneley cannot claim that the ouster trial should have been stayed because Good's Fifth Amendment rights may have been implicated. The privilege against self-incrimination is personal as it "adheres basically to the person, not to information that may incriminate him." *Couch v. United States*, 409 U.S. 322, 328, 34 L. Ed. 2d 548, 93 S. Ct. 611 (1973). Meneley could not assert Good's privilege for him.

We also pause to note that a stay in a civil case is an extraordinary remedy. See *In re Par Pharmaceutical Inc. Securities Litigation*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990); *Schuessler v. Benchmark Mktg. & Consulting*, 243 Neb. 425, 432, 500 N.W. 2d 529 (1993).

Meneley argues that because this issue implicates the Fifth Amendment, our review should be de novo.

It is within the district court's discretion whether to grant a stay or continuance in a civil trial where there are criminal charges pending against a party arising from the same set of facts. See *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) (reviewing trial court's refusal to stay civil proceedings while parallel criminal action pending under abuse of discretion standard of review); *Jackson v. Johnson*, 985 F. Supp. 422, 424 (S.D.N.Y. 1997) (noting that court had discretion to determine whether to stay civil litigation while similar criminal proceedings were pending);*S.E.C. v. Incendy*, 936 F. Supp. 952, 955 (S.D. Fla. 1996) (it is permissible for simultaneous or successive prosecution of civil and criminal actions and it is within the trial court's discretion to stay the civil proceedings); *Ex parte Pegram*, 646 So.2d 644, 645-46 (Ala. 1994) (it is within the trial court's discretion whether to grant a stay of civil proceedings when parallel criminal proceedings are pending); *Avant! Corp. v. Superior Court*, 79 Cal. App. 4th 876, 886, 94 Cal. Rptr. 2d 505 (2000) (appellate court reviews district court's refusal to stay civil proceedings pending criminal outcome on an abuse of discretion standard of review); *Schuessler*, 243 Neb. at 429 (determination of granting stay for civil case when

there is a similar criminal matter pending against the same party within the discretion of the trial court).

Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999). The party seeking the stay bears the burden of proof to establish that the stay is necessary. *Midlands Utility, Inc. v. S.C.D.H.E.C.*, 287 S.C. 483, 486, 339 S.E. 2d 862 (1986).

Prior to the start of the ouster trial, Meneley moved the court for a stay of the civil proceedings. The district court denied the motion, stating:

"In these circumstances, Sheriff Meneley is not deprived of free choice to admit, to deny, or to refuse to answer any question that may incriminate him. The Fifth Amendment protects citizens from being compelled to offer proof against themselves in a criminal prosecution. The privilege clearly is available to Sheriff Meneley in this civil proceeding.

"The Fifth Amendment privilege does not preclude prosecution of the ouster. It does not require that this Court grant full immunity, dismissal or enter a stay. Sheriff Meneley may remain silent in all criminal and civil proceedings. The burden of proof in both cases, although different, remains with the government. The Fifth Amendment prohibits adverse inference to be drawn from execution of the privilege in the criminal prosecution. The Fifth Amendment does not preclude adverse inference to be drawn from silence in the ouster, although state law may afford more protection. See K.S.A. 60-439."

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."

The Fifth Amendment does not, however, mandate a stay of civil proceedings pending the outcome of similar or parallel criminal proceedings. See *Keating*, 45 F.3d at 324 (the Constitution does not require a stay of civil proceedings pending the outcome of criminal proceedings); *Afro-Lecon, Inc. v. U.S.*, 820 F.2d 1198, 1202 (Fed. Cir. 1987) (court does not have to grant stay for civil action when there is a pending criminal action of a similar nature as there is no constitutional requirement to do so); *S.E.C. v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 666 (5th Cir. 1981) (there is no general federal constitutional, statutory, or common-law rule barring the government from prosecuting both a civil and

criminal action at the same time against the same party even where both actions are the result of the same set of circumstances); *Fidelity Nat. Title v. National Title Resources*, 980 F. Supp. 1022, 1023-24 (D. Minn. 1997) (trial court is not required to stay civil litigation pending outcome of similar criminal action); *Harris v. U.S.*, 933 F. Supp. 972, 974 (D. Idaho 1995) (citing *Keating* while noting that the Constitution does not require a stay of civil litigation while similar criminal action is pending); *Southwest Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 809 (N.D. Cal. 1989) (there is no constitutional requirement that a civil action must be stayed pending the outcome of a parallel criminal case); *In re Tower Metal Alloy Co.*, 188 Bankr. 954, 956 (Bankr. S.D. Ohio 1995) (the Constitution is ordinarily not implicated by a trial court's decision concerning whether to stay civil proceedings while similar criminal proceedings are pending); *Ex parte Windom*, 763 So.2d 946, 950 (Ala. 2000) (affirming trial court's refusal to stay the civil proceedings while parallel criminal action was being taken against defendant); and *Schuessler*, 243 Neb. at 428-29 (there is no constitutional right to have a civil proceeding stayed pending the outcome of criminal action against the same party arising from a similar matter).

Although Meneley claims that he could not take the stand in the ouster trial because he might have incriminated himself in the subsequent criminal matter, the position that he was put in did not deny him his Fifth Amendment right to remain silent, nor did it prevent him from successfully defending himself in the ouster trial. The *Keating* court specifically noted:

"A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege. Not only is it permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding." 45 F.3d at 326 (referring to *Baxter v. Palmigiano*, 425 U.S. 308, 318, 47 L. Ed. 2d 810, 96 S. Ct. 1551 [1976]).

See also *Incendy*, 936 F. Supp. at 956 (referring to *Baxter* and noting that the Constitution is not violated by forcing an individual

to risk "non-criminal disadvantage" by remaining silent in a civil proceeding out of fear that he will incriminate himself in a subsequent criminal action); *Brock v. Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y. 1985) (citing *Baxter* and noting that it is not unconstitutional to force a litigant to choose between invoking the Fifth Amendment in a civil case, while risking a loss there, or answering questions in the civil case, thus risking subsequent criminal prosecution).

Likewise, in *International Business Machines Corp. v. Brown*, 857 F. Supp. 1384, 1389 (C.D. Cal. 1994), the court discussed the tough decision that must be made by a party facing simultaneous or successive civil and criminal trials, stating:

"[T]he contention that being forced to choose between the compulsion to testify in a civil suit in order to avoid an adverse result on the merits undermines the right to remain silent in a criminal matter, while having surface appeal, will not stand analysis. While the 'choice between testifying or invoking the Fifth Amendment may be difficult, . . . it does not create the basis for a stay.' [Citations omitted.]"

Notwithstanding the fact that there is no direct Fifth Amendment violation in refusing to stay a civil proceeding, courts have analyzed the issue by addressing several factors. In *Keating*, the 9th Circuit Court of Appeals discussed the factors a court should consider when determining whether to stay civil proceedings while parallel criminal charges are pending. The court stated:

"The decision whether to stay civil proceedings in the face of a parallel criminal proceeding should be made 'in light of the particular circumstances and competing interests involved in the case.' [Citation omitted.] This means the decisionmaker should consider 'the extent to which the defendant's fifth amendment rights are implicated.' [Citation omitted.] In addition, the decisionmaker should generally consider the following factors: (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interest of persons not parties to the civil litigation; and (5) the interests of the public in the pending civil and criminal litigation." 45 F.3d at 324-25.

See also *Golden Quality Ice Cream Co. v. Deerfield Specialty*, 87 F.R.D. 53, 56-58 (E.D. Penn. 1980) (discussing in detail the five factors to be considered).

Whether a party's Fifth Amendment rights are implicated is a significant factor for the district court to consider, "but it is only one consideration to be weighed against others." *Federal Sav. and Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902-03 (9th Cir. 1989).

In the present case, we find the first and fifth factor to be extremely strong, justifying the district court's refusal to grant the stay in this matter. Because Meneley was a public officer, the State had a strong interest in "proceeding expeditiously" with the litigation. The public interest was similarly strong in progressing with the ouster trial. Meneley could have taken the stand in the ouster trial and asserted his Fifth Amendment rights as needed while still defending himself against the charges. The district court did not abuse its discretion in denying Meneley's request for a stay in the civil ouster trial.

## II. ATTORNEY-CLIENT PRIVILEGE

Meneley argues that the district court erred by admitting the testimony of Welch because it was inadmissible and protected by the attorney-client privilege.

During the ouster trial, Welch testified that Meneley called him and asked him for advice on how to handle an officer who was using cocaine. Welch testified that he told Meneley to review a case that Welch had handled previously which involved a KBI agent who had become addicted to drugs and who had taken drug evidence to support his habit. During the conversation, Welch told Meneley that he could not represent him. Welch further testified that he had a second conversation with Meneley where it was suggested that the matter be handled as a worker's compensation matter.

Prior to trial, Meneley moved the court to declare that Welch's testimony was inadmissible on the basis that it was protected as attorney-client communication. Meneley asserted that (1) the conversations between him and Welch never took place; and (2) that even if they did take place, they were privileged. The court denied the motion.

In denying the motion, the court stated:

"The defense has renewed its Motion to Exclude Testimony of James Welch. Sheriff Meneley has maintained throughout this proceeding that he never spoke with Welch about Oblander. However, the Sheriff argues a contingent position. The Sheriff contends that if the Court believes Welch's testimony it should be excluded through application of the attorney/client privilege. The Court rejected Meneley's argument before trial, overruled his objection to the admission of Welch's testimony at trial and now reconsiders the ruling and still concludes that the testimony should be considered.

. . . .

"The Court finds, as a matter of fact, that there has never been an attorney/ client relationship between Meneley and Welch and further finds that there was not an attorney/client relationship arising out of the communications at issue. Welch has been an attorney since the 1970's. He first became acquainted with David Meneley when Welch was employed as an Assistant District Attorney. Meneley was then a narcotics officer in the Topeka Police Department. Welch has never been in private practice. He has been employed at different times by the city, county or state. Meneley's defense claims there was no attorney/client relationship between Meneley and Welch and that the conversations which Welch relates did not happen. The defense attacks the credibility of Welch's testimony pointing out that there are more than 1,000 attorneys in Topeka. Therefore, Meneley's defense argues it stretches credibility to believe that Meneley would seek legal advice from Welch.

"Welch also denies that there was ever any attorney/client relationship between himself and David Meneley. The Court finds as a matter of fact that Meneley was not Welch's client. Meneley did not consult Welch as an attorney in his professional capacity to obtain legal advice or service. The contingent claim of privilege is focused on comments made by Meneley about wanting to put Oblander on workers' compensation rather than follow procedures in the *Woodworth* case. The privilege does not apply unless a client is seeking legal advice. Here the Court finds not only that Meneley is not a client but the substance of the communication was not directed at seeking legal advice. Meneley was seeking a consensus of how to manage a personnel issue. The inquiry which Meneley was making was related to potential personnel or workers' compensation issues for which the county would be legally liable or responsible. As the Sheriff, Meneley is the official responsible for his department and is subject to follow personnel policies of the county in relation to the county employees under his supervision. See K.S.A. 19-805(d).

"Nothing about this communication suggests that Meneley was seeking any advice in a personal capacity regarding his personal or potential personal liability. Had Meneley posed the question to Welch in the context that he was considering covering up Oblander's drug use, it perhaps could be said that he was seeking legal advice in his personal capacity.

"Even if the Court were to find that Meneley was a client, Welch was his lawyer, that there was a communication between Welch and Meneley in the course of that relationship and in professional confidence about legal rather than business

advice, the Court still finds the testimony to be properly admitted. There is no evidence that Meneley suffers from any mental incapacity. On the contrary, the Sheriff by virtue of his years of law enforcement training and professional experience is more sophisticated than an average layperson regarding the confidentiality that may attach to an attorney/client communication. Notwithstanding, Meneley without any fraud, deception or trickery and of his own volition disclosed to Jaramillo and Blume within a few weeks the same alleged confidences about Oblander's drug use and addiction which were disclosed to Welch. Thus, the Court holds that to the extent any attorney/client privilege ever attached, it was waived by reason of Meneley's voluntary disclosures to Jaramillo and Blume."

"The privilege protecting confidential communications between attorney and client is the oldest of the common-law privileges and has for its purpose the fostering of full and frank communication between lawyers and their clients." *R.I.M.C. v. W.A.R.F.*, 114 F.R.D. 672, 675 (W.D. Wisc. 1987) (citing to *Upjohn Co v. United States*, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 [1981]).

The attorney-client privilege "should be strictly confined within the narrowest possible limits." *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983); *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979). The reason the privilege is so restricted is that it deprives the factfinder from otherwise relevant information. *Fisher v. United States*, 425 U.S. 391, 403, 48 L .Ed. 2d 39, 96 S. Ct. 1569 (1976).

K.S.A. 60-426 sets forth the attorney-client privilege and states in pertinent part:

"(a) *General rule.* Subject to K.S.A. 60-437, and except as otherwise provided by subsection (b) of this section[,] communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (1) if he or she is the witness to refuse to disclose any such communication, and (2) to prevent his or her lawyer from disclosing it, and (3) to prevent any other witnesses from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated by the client, or (iii) as a result of a breach of the lawyer-client relationship."

Meneley's argument on this issue fails for three reasons: (1) Meneley failed to satisfy the burden of proof in showing that an attorney-client relationship existed; (2) Meneley waived any privilege he may have had by discussing the matter with Jaramillo and

Blume; and (3) once Meneley placed the fact of the relationship in question he waived the privilege.

The assertion of the privilege depends on the finding of an attorney-client relationship. *Barr Marine Products Co., Inc. v. Borg-Warner*, 84 F.R.D. 631, 633-35 (E.D. Pa. 1979). An attorney-client relationship is not dependent on the payment of a fee, nor is there a requirement that the relationship be memorialized by contract. The relationship may be implied from the conduct of the parties. The relationship is sufficiently established when it is shown that the advice and assistance of the attorney is sought and received in matters pertinent to the profession. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 266 Kan. 1047, 1053, 975 P.2d 231 (1999).

The party asserting the privilege bears the burden of proof for establishing all of the essential elements. *Matter of Bevill, Bresler & Schulman Asset Manag.*, 805 F.2d 120, 126 (3d Cir. 1986); *P. & B. Marina, Ltd Partnership v. Logrande*, 136 F.R.D. 50, 53-54 (E.D. N.Y. 1991); *R.I.M.A.C.*, 114 F.R.D. at 675.

Meneley, therefore, had the burden of proof to show that an attorney-client relationship existed with Welch. Meneley, however, argues that he never spoke with Welch. Meneley did not meet his burden of proof in showing that there was an attorney-client relationship with Welch. Because there was no attorney-client relationship, Meneley cannot claim an attorney-client privilege.

The attorney-client privilege belongs to the client, but it may be asserted by the attorney on the client's behalf. *Schwimmer v. United States*, 232 F.2d 855, 863 (8th Cir. 1956). Only the client, however, may waive the privilege. The waiver may either be express or implied by conduct that "extinguishes one of the necessary elements of the privilege." *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985).

Meneley may not claim an attorney-client privilege, as he waived any privilege he may have had by discussing Oblander's drug use with Jaramillo and Blume.

K.S.A. 60-437 governs the waiver of an attorney-client privilege and states:

"A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with

respect to that matter if the judge finds that such person or any other person while the holder of the privilege has (a) contracted with a party against whom the privilege is claimed that he or she would not claim the privilege or, (b) without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone."

"A client's disclosure to a third party of a communication made during a confidential consultation with his attorney 'eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege.' " *United States v. Aronoff*, 466 F. Supp. 855, 862 (S.D.N.Y. 1979) (quoting *In re Horowitz*, 482 F.2d 72, 81 [2d Cir.], *cert. denied* 414 U.S. 867 [1973]). See also *U.S. v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989) (voluntary disclosure by the client is "inconsistent with the attorney-client relationship" and acts as waiver to privilege); *United States v. Buljubasic*, 808 F.2d 1260, 1268 (7th Cir. 1987) (waiver of attorney-client privilege occurs when client reveals confidential portion of communication to third party); *In re Subpoena Duces Tecum*, 738 F.2d 1367, 1369-70 (D.C. Cir. 1984) (voluntary disclosure by the privilege holder is "inconsistent with the confidential nature of the relationship" and acts as a waiver to the privilege); *von Bulow by Auersperg v. von Bulow*, 114 F.R.D. 71, 75-76 (S.D.N.Y. 1987) (attorney-client privilege only applies to private communications between attorney and client, but does not apply when client "subsequently discloses to others" the information given to attorney); *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 390 (D.D.C. 1978) (privilege is waived when client subsequently reveals confidential information to third party); *Volpe v. Conroy, Simberg & Ganon, P.A.*, 720 So.2d 537, 539 (Fla. Ct. App. 1998) (attorney-client privilege is waived when information is disclosed to third parties by privilege holder); *Visual Scene v. Pilkington Brothers, plc*, 508 So.2d 437, 440 (Fla. Dist. App. 1987) (privilege is waived when holder voluntarily discloses information to third party); *State ex rel. McCormick v. Zakaib*, 189 W. Va. 258, 261, 430 S.E. 2d 316 (1993) (privilege is waived by voluntary disclosure by privilege holder to third parties).

"The theoretical predicate underlying all recognized privileges is that secrecy and confidentiality are necessary to promote the relationship fostered by the privilege. Once the secrecy or confidentiality is destroyed by a voluntary disclosure to a third party, the rationale for granting the privilege in the first instance no longer applies." *In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 464 (S.D.N.Y. 1973).

See also *Houser v. Frank*, 186 Kan. 455, 458, 350 P.2d 801 (1960) (privilege is waived when client begins to testify as to communications made with attorney); *Hutton v. Hutton*, 184 Kan. 560, 564-65, 337 P.2d 635 (1959) (privilege is waived when holder makes statements to attorney in the presence of a third party); *Cherryvale Grain Co. v. First State Bank of Edna*, 25 Kan. App. 2d 825, 833, 971 P.2d 1204 (1999) (presence of third person when client communicates with attorney destroys the privilege).

In the present case, there is substantial competent evidence to support the district court's determination that Meneley had the same conversation with Jaramillo and Blume as he had with Welch. Discussing the matter with third parties prevents Meneley from claiming the attorney-client privilege.

Meneley cannot claim an attorney-client privilege when he placed the fact of the communication at issue. The privilege is waived when the party claiming it puts the fact of the communication at issue. *R.I.M.A.C.*, 114 F.R.D. at 679; *Hearn v. Rhay*, 68 F.R.D. 574, 579-81 (E.D. Wash. 1975).

The district court did not err in denying Meneley's motion to prevent Welch from testifying.

### III. ATTORNEY GENERAL'S OFFICE

Meneley argues that the district court erred when it denied his motion to disqualify the Attorney General's office from representing the plaintiff in this case.

When considering whether an attorney or firm should be disqualified in a given case, the appellate court decides whether the trial court's findings of fact are (1) supported by substantial competent evidence and (2) sufficient to support the conclusions of law. *Zimmerman v. Mahaska Bottling Co.*, 270 Kan. 810, 814, 19 P.3d 784 (2001); *State v. Drach*, 268 Kan. 636, 643, 1 P.3d 864

(2000); *Lansing-Delaware Water District v. Oak Lane Park, Inc.*, 248 Kan. 563, Syl. ¶ 3, 808 P.2d 1369 (1991).

Prior to trial, Meneley moved the court to disqualify the Attorney General's office from representing the plaintiff on the basis that Welch had formerly represented Meneley, and under the Kansas Rules of Professional Conduct (KRPC), the Attorney General's office was subject to imputed disqualification. The district court denied the motion.

Specifically, Meneley argues that he divulged confidential privileged information to Welch when he spoke with him by phone. We have already decided that no privilege existed after Meneley divulged the same information to Jaramillo and Blume. Meneley now asserts that because Welch was his attorney, the Attorney General's office should be disqualified under KRPC 1.10(b) (2000 Kan. Ct. R. Annot 349). Meneley further argues that it was improper for the district court to decide the motion without holding a formal hearing.

KRPC 1.10(b) governs imputed disqualification and sets forth in pertinent part:

"When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer is associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter."

In order to disqualify a firm under KRPC 1.10(b), there must be an attorney-client relationship. See *Drach*, 268 Kan. at 644 (court must first determine whether there was an attorney-client relationship before there can be a violation of the KRPC); *Associated Wholesale Grocers*, 266 Kan. at 1053 (attorney-client relationship must be established before a violation under KRPC 1.9 [2000 Kan. Ct. R. Annot. 347] or KRPC 1.10 exists); *Chrispens v. Coastal Refining & Mktg., Inc.* 257 Kan. 745, 756, 897 P.2d 104 (1995) (in order to establish disqualification of attorney or firm, it must be first shown that there was an attorney-client relationship).

The burden to show that an attorney-client relationship exists rests on the movant seeking disqualification. *Drach*, 268 Kan. at 643; *Chrispens*, 257 Kan. at 756.

Meneley, therefore, carried the burden of proof to show that an attorney-client relationship existed with Welch. Meneley, however, contends that he never spoke with Welch and denies that they ever had the conversations that Welch testified to at trial. Meneley did not meet his burden of proof in proving that there was an attorney-client relationship with Welch. Because there was no attorney-client relationship, there can be no violation of KRPC 1.10(b). The district court did not err in refusing to hold an evidentiary hearing on imputed disqualification and did not err in denying Meneley's motion to disqualify the Attorney General's office from participating in this case.

## IV. INVESTIGATION AFTER OUSTER CASE FILED

Meneley argues that the district court erred by allowing the State to continue with its investigation after the ouster case was filed.

It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it. *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

Prior to trial, Meneley filed a motion for injunctive relief seeking to enjoin the Attorney General from prosecuting the ouster action pursuant to K.S.A. 60-1206. The motion was denied.

K.S.A. 60-1206 governs the initiation of the ouster complaint and reads in pertinent part:

"(a) *On complaint.* The attorney general or any county attorney in the county of his or her jurisdiction, upon receiving written notice that an officer covered by K.S.A. 60-1205 has violated any of the provisions thereof, shall investigate the complaint. If reasonable cause is found for the complaint, proceedings shall be

"instituted to oust such officer, but proceedings may be initiated by the attorney general or the county attorney without complaint having been made."

Meneley raises two points on this issue. Both are without merit. First, Meneley argues that K.S.A. 60-1206 requires all investigation to be complete upon the filing of the ouster petition. Second, he argues that the district court lacked jurisdiction over the case because it was not asserted in the ouster petition that an investigation had been completed.

Meneley acknowledges that *State ex rel. Miller v. Richardson,* 229 Kan. 234, 623 P.2d 1317 (1981), directly addresses this issue but argues that times are different now and that ouster proceedings should be handled differently. We disagree. In *Richardson,* this court plainly held that there is no error in allowing the plaintiff to proceed with inquisitorial proceedings after the ouster complaint has been filed in court. 229 Kan. at 237-38. In the 20 years since the decision, the legislature has not seen fit to amend K.S.A. 60-1206. A plain reading of the statute reveals that there is no requirement that the inquisition be complete before the filing of the complaint.

Likewise, K.S.A. 60-1206 does not limit the jurisdiction of the district court. There is no requirement that the petition state that the investigation is complete. The district court had jurisdiction to hear the ouster case against Meneley. This argument is without merit.

## V. MOTION FOR INJUNCTIVE RELIEF

Meneley argues that the district court erred when it denied his motion for injunctive relief.

Meneley attempts to frame this issue as one involving the interpretation of K.S.A. 60-901 seeking a de novo review. This issue, however, does not involve the interpretation of a statute. It centers on the decision whether to provide injunctive relief. We do not need to interpret K.S.A. 60-901 in order to decide this issue. The granting of an injunction is equitable in nature and involves the exercise of judicial discretion. *Williams Natural Gas Co. v. Supra Energy, Inc.,* 261 Kan. 624, 631, 931 P.2d 7 (1997); *Linn Valley Lakes Property Owners Ass'n v. Brockway,* 250 Kan. 169, 171, 824

P.2d 948 (1992). The party asserting the abuse of discretion bears the burden of proof. *Kansas East Conf. of the United Methodist Church v. Bethany Med. Ctr.*, 266 Kan. 366, 378, 969 P.2d 859 (1998); *State v. Harris*, 262 Kan. 778, 785, 942 P.2d 31 (1997).

Prior to trial, Meneley sought an injunction seeking to (1) prohibit Welch from testifying; (2) stay the ouster trial on the basis of his Fifth Amendment rights and the Fifth Amendment rights of Good; (3) disqualify the Attorney General's office from representing the plaintiff; and (4) dismiss the case pursuant to K.S.A. 60-1206. K.S.A. 60-901 sets forth: "Injunction is an order to do or refrain from doing a particular act. It may be the final judgment in an action, and it may also be allowed as a provisional remedy."

Essentially, Meneley's request for injunctive relief mirrored the same arguments he made previously to the district court, which were all rejected by the court. Because we, too, have already decided these issues, this issue must fail. The district court did not abuse its discretion in denying the motion for injunctive relief.

## VI. APPEAL BASED ON INJUNCTIVE RELIEF

Meneley argues that the district court erred in proceeding to trial after he filed and perfected an appeal based on the court's denial of his motion for injunctive relief.

Analysis of this issue involves interpretation of statutes. Our review is, therefore, unlimited. *Sebelius v. LaFaver*, 269 Kan. 918, Syl. ¶ 1, 9 P.3d 1260 (2000).

After the district court denied Meneley's motion requesting an injunction pursuant to K.S.A. 60-901 as previously described, he filed and perfected an appeal pursuant to K.S.A. 60-2102(a)(2). Meneley also filed a motion for an emergency stay. The Court of Appeals denied the motion for an emergency stay.

Meneley argues that once the appeal was docketed and perfected, the district court no longer had jurisdiction to continue with the ouster trial. It is argued that all events which occurred after the appeal was docketed and perfected were null and void. We disagree. K.S.A. 60-2102 reads in pertinent part:

"(a) *As of right.* Except for any order or final decision of a district magistrate judge, the appellate jurisdiction of the court of appeals may be invoked by appeal as a matter of right from:

(1) An order that discharges, vacates or modifies a provisional remedy.

(2) An order that grants, continues, modifies, refuses or dissolves an injunction, or an order that grants or refuses relief in the form of mandamus, quo warranto or habeas corpus."

The fallacy of Meneley's argument is that his motion seeking an injunction with the district court was just another way to get the district court to revisit issues it had already decided adversely to his case. The injunction Meneley sought was an injunction requiring the district court to render a different opinion on previously denied motions. Meneley cannot obtain an interlocutory appeal merely by renaming an earlier denied motion as one seeking an "injunction." The denial of the motion to disqualify the Attorney General's office was not automatically appealable. Neither was the denial of the motion to prevent Welch from testifying at trial. The denial of the motion to stay the civil proceedings pending the outcome of the criminal trial was not immediately appealable either. Meneley cannot take adverse decisions by the district court, cut and paste the arguments onto a new document, and slap the title "motion seeking injunction" on them in an effort to effectuate an interlocutory-like appeal in the event the "new" motion is denied. The filing of the appeal, based on the denial of an "injunction," did not divest the district court of jurisdiction in this case.

## VII. TWO JUDGES

Meneley argues that the district court erred when it proceeded with the ouster trial using two judges instead of three. In the alternative, Meneley asserts that the ouster case should have been tried before an advisory jury.

The use of an advisory jury in a quo warranto proceeding is within the discretion of the district court. *Richardson*, 229 Kan. at 241. Likewise, the district court's decision to try the case with only two judges instead of three was within its discretion.

There is no right to a trial by a full jury in quo warranto proceedings. *Richardson*, 229 Kan. at 241. Meneley argues that because of the controversial nature of the case, the ouster trial should have been tried by a three-judge panel, or at least an advisory jury,

pursuant to K.S.A. 60-239. K.S.A. 60-239(c) states in pertinent part:

"*Advisory jury and trial by consent.* In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or (except in actions against the state when a statute of the state provides for trial without a jury) the court, with the consent of all parties, may order a trial with a jury whose verdict shall have the same effect as if trial by jury had been a matter of right."

Meneley filed a motion to recuse Judge Marla Luckert from participating as one of the three panel members. Judge Luckert recused herself from the ouster trial. She was not replaced. The decision was made to proceed with two judges instead of the three. When questioned about the possibility of a tie decision, Judge Richard Anderson stated: "The burden of proof rests with the State in this case. They need to persuade both judges of the merits and factual positions. If there is a tie, the tie goes to the defendant."

A panel of three judges has historically been used in ouster proceedings. See *Richardson,* 229 Kan. at 241; *State, ex rel., v. Cahill,* 222 Kan. 570, 567 P.2d 1329 (1977). There is nothing in the quo warranto statutes, however, which require a three-judge panel. K.S.A. 60-1201 *et seq.* Likewise, there is nothing in either *Richardson* or *Cahill,* cited by Meneley, or Kansas case law which mandates the use of a three-judge panel.

The district court did not abuse its discretion in trying the ouster case with two judges. Likewise, there was no abuse of discretion in refusing to empanel an advisory jury.

## VIII. MOTION FOR CONTINUANCE

Meneley argues that the district court erred when it denied his motion for a continuance when his previous counsel was forced to withdraw 2 weeks before trial.

The trial court's ruling on a motion for a continuance will not be disturbed on appeal absent an abuse of discretion. *Miller v. Botwin,* 258 Kan. 108, 121, 899 P.2d 1004 (1995).

This ouster action was filed on May 24, 1999. Attorney William K. Rork filed an answer and represented Meneley during the pretrial proceedings. At the same time Rork was defending Meneley

in the related criminal case for perjury, he also represented Oblander in his criminal case. The district attorney sought and obtained an order removing Rork from Meneley's representation in the criminal case, due to the potential for a conflict of interest between Meneley and Oblander.

Rork subsequently sought to withdraw from this case. Meanwhile, Meneley hired the Phelps attorneys in the criminal case.

Rork was allowed to withdraw on January 4, 2000. The district court advised that the ouster trial would continue on January 14, 2000, with the Phelps attorneys acting as counsel for Meneley.

Meneley argues that his attorneys did not have adequate time to prepare for the ouster trial. We cannot say from the record before us that the district court abused its discretion in denying the motion for a continuance.

## IX. STATUTE OF LIMITATIONS

Meneley argues that the district court erred in finding that no statute of limitations applied in the ouster case and in denying his motion to dismiss filed on the statute of limitations grounds. This issue involves the interpretation of statutes. Our review is, therefore, unlimited.

Prior to trial, Meneley filed a motion for partial dismissal on the grounds that the statute of limitations had run. The motion was denied.

Meneley argues that quo warranto proceedings are governed by the rules of civil procedure pursuant to K.S.A. 60-1201. He specifically argues that K.S.A. 60-514(c) applies to the present ouster action. K.S.A. 60-514 sets forth:

"The following actions shall be brought within one year:
"(a) An action for libel or slander.
"(b) An action for assault, battery, malicious prosecution or false imprisonment.
"(c) *An action upon statutory penalty or forfeiture.*
"(d) An action brought pursuant to K.S.A. 43-173. Such action shall be brought within one year from the date of discharge or threat of discharge from employment." (Emphasis added.)

Meneley argues that a quo warranto action seeking ouster from office is a "forfeiture" and, therefore, a 1-year statute of limitation

is required. Since several of the acts of misconduct alleged in the ouster petition occurred outside the 1-year limitation, Meneley asserts that the district court erred in denying his motion for partial dismissal.

K.S.A. 60-514 does not apply to the present case. An ouster is not a "forfeiture" of the nature contemplated by the statute.

The State argues, on the other hand, that K.S.A. 60-521 applies. K.S.A. 60-521 sets forth:

"As to any cause of action accruing to the state, any political subdivision, or any other public body, which cause of action arises out of any proprietary function or activity, the limitations prescribed in this article shall apply to actions brought in the name or for the benefit of such public body in the same manner as to actions by private parties, except in (1) actions for the recovery of real property or any interest therein, or (2) actions to recover from any former officers or employee for his or her own wrongdoing or default in the performance of his or her duties."

K.S.A. 60-521, by negative implication, retains governmental immunity from the statute of limitations for causes of action arising out of a governmental function. *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 659, 941 P.2d 1321 (1997); *State ex rel. Schneider v. McAfee*, 2 Kan. App. 2d 274, 275, 578 P.2d 281, *rev. denied* 225 Kan. 845 (1978).

Governmental functions are those performed for the general public with respect to the common welfare for which no compensation or particular benefit is received. Proprietary functions, on the other hand, are exercised when an enterprise is commercial in character or is usually carried on by private individuals or is for the profit, benefit, or advantage of the governmental unit conducting the activity. *McAfee*, 2 Kan. App. 2d at 276. See also *International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, Syl. ¶ 3, 798 P.2d 960 *rev. denied*, 248 Kan. 996 (1991) (governmental powers are exercised to "administer the affairs of the state and promote the public welfare generally").

Quo warranto proceedings seeking ouster of a public official are a governmental function. See *State, ex rel., v. Showalter*, 189 Kan. 562, 569, 370 P.2d 408 (1962) (noting that the purpose of the ouster proceeding is not to punish the public officer but to "protect and preserve the office and prevent its further embarrassment by

the unfaithful holder"). No statute of limitations is, therefore, applicable. The district court did not err in denying Meneley's motion to dismiss based on the statute of limitations.

## X. MOTION TO DISQUALIFY ALL SHAWNEE COUNTY JUDGES

Meneley argues that the district court erred in denying his motion to disqualify all Shawnee County judges from his ouster trial.

When faced with an affidavit of prejudice filed pursuant to K.S.A. 20-311d, this court has unlimited review, and on appeal must decide the legal sufficiency of the affidavit and not the truth of the facts alleged. *St. David's Episcopal Church v. Westboro Baptist Church, Inc.*, 22 Kan. App. 2d 537, 554-55, 921 P.2d 821 (1996); *State v. Clothier*, 20 Kan. App. 2d 994, 996, 894 P.2d 257 (1995). We examine whether the affidavit provides facts and reasons pertaining to the party or his or her attorney which, if true, give fair support for a well-grounded belief that he or she will not obtain a fair trial. *Smith v. Printup*, 262 Kan. 587, Syl. ¶ 7, 938 P.2d 1261 (1997). We determine whether the charges are grounded in facts that would create reasonable doubt concerning the court's impartiality, not in the mind of the court itself, or even necessarily in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances. *Smith*, 262 Kan. 587, Syl. ¶ 8.

Meneley was notified prior to trial that Judge Anderson, Judge Dowd, and Judge Luckert would hear the ouster case against him. Meneley subsequently filed a motion to disqualify the judges. The motion was denied as to Judges Dowd and Anderson but granted as to Judge Luckert. The district court found that the allegations set forth by Meneley in his motion were legally insufficient as to Judges Dowd and Anderson.

Meneley brought his motion to change judges pursuant to K.S.A. 20-311d. K.S.A. 20-311d sets forth in pertinent part:

"(a) If a party or a party's attorney believes that the judge *to whom an action is assigned* cannot afford that party a fair trial in the action, the party or attorney may file a motion for change of judge. The motion shall not state the grounds for the party's or attorney's belief. The judge shall promptly hear the motion infor-

mally upon reasonable notice to all parties who have appeared in the case. If the judge disqualifies the judge's self, the action shall be assigned to another judge by the administrative judge. If the judge refuses to disqualify the judge's self, the party seeking a change of judge may file the affidavit provided for in subsection (b). If an affidavit is to be filed it shall be filed forthwith.

"(b) If a party or a party's attorney files an affidavit alleging any of the grounds specified in subsection (c), the administrative judge shall at once determine, or refer the affidavit to another district judge for prompt determination of, the legal sufficiency of the affidavit." (Emphasis added.)

Pursuant to K.S.A. 20-311d, the motion to change judges is limited to the judges assigned to the matter. Meneley's motion for change of judge was, therefore, limited to Judges Dowd, Anderson, and Luckert. In the affidavits filed pursuant to K.S.A. 20-311d, Meneley asserted, among other things, that (1) he and his staff and the department employees, who were his accusers, regularly appeared before all the judges of the 3rd Judicial District; (2) all of the judges of the 3rd Judicial District were exposed to "intense local publicity" surrounding the perjury charges and the ouster case; (3) the ouster action arose in a "politically charged environment" surrounding the judges of the 3rd Judicial District; and (4) all of the judges of the 3rd Judicial District removed themselves from the criminal case where he was alleged to have committed perjury.

Following the partial denial of his motion, Meneley filed a motion for partial reconsideration, or in the alternative, to certify the issue for interlocutory appeal. The motion was denied.

The affidavits filed by Meneley do not support Meneley's charge of impartiality against Judges Dowd and Anderson. The facts alleged by Meneley do not create reasonable doubt as to Judges Dowd's and Anderson's ability to hear the ouster case. The district court did not err in denying Meneley's motion to change judges.

## XI. FALSE TESTIMONY

Meneley argues that the district court erred in finding that he had given false testimony.

Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and

whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can be reasonably resolved. *Sampson v. Sampson*, 267 Kan. 175, 181, 975 P.2d 1211 (1999). The appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 496-97, 961 P.2d 696 (1998).

The State sought ouster on 13 grounds. At the close of the State's case, five of the counts relating to criminal background checks were dismissed. In the order of ouster, the district court rejected claims that (1) Meneley testified falsely on February 22, 1999, in the *Hernandez* case; (2) Meneley knowingly permitted criminal cases to be forwarded for prosecution and conviction without revealing that evidence had been compromised; (3) Meneley willfully failed to adequately investigate missing drug evidence; or (4) Meneley failed to preserve the integrity of evidence collected by members of his department to ensure a fair prosecutorial system.

The district court, however, found that Meneley knew of Oblander's drug use and therefore (1) concealed knowledge of Oblander's drug theft from the 1996 KBI investigation; (2) gave false testimony by denying knowledge of Oblander's drug use on April 11, 1996, in his statement to the KBI; and (3) gave false testimony in the *Hernandez* hearing on March 9, 1999, when he denied knowledge of Oblander's drug use.

Meneley specifically argues that the witnesses who testified against him were not credible and, therefore, the district court could not have found that Meneley had given false testimony. We will not pass on the credibility of witnesses or attempt to reweigh their testimony. In commenting on the testimony of Jaramillo and Blume, the district court stated:

"The Court finds the testimony of Daniel Jaramillo and Phil Blume to be true. Both witnesses are found to be credible. The facts to which they each testified were distinctly remembered. The details in connection with their July, 1995, conversation with Sheriff Meneley were reported precisely and coherently. The testimony of Detective Jaramillo and Deputy Blume was clear, direct and weighty.

The Court finds their testimony about their July, 1995, meeting with Sheriff Meneley, and the statements they attribute to the Sheriff, which discloses Oblander's drug use, addiction and treatment, to be convincing, reasonable and persuasive."

There is substantial competent evidence to support the findings of the district court.

Meneley further asserts that the district court erred in making its findings because he was not allowed to testify in his defense and that Good was not allowed to testify on behalf of Meneley. Having resolved this issue earlier in this opinion, we find no merit in Meneley's assertions here.

## XII. LACHES

We review a trial court's application or denial of the doctrine of laches under an abuse of discretion standard of review. See *In re Marriage of Fogarty & Rasbeary*, 78 Cal. App. 4th 1353, 1364, 93 Cal. Rptr. 2d 653 (2000) (noting that the better rule is to apply an abuse of discretion standard of review when determining whether the trial court erred in refusing to apply the doctrine of laches); *In re Marriage of Opp*, 516 N.W.2d 193, 196 (Minn. Ct. App. 1994) (applying abuse of discretion standard to doctrine of laches); and *Miss.-Fox River Drainage No. 2 v. Plenge*, 735 S.W.2d 748, 754 (Mo. App. 1987) (appropriate standard of review is abuse of discretion when considering whether trial court erred in applying doctrine of laches).

Prior to trial, Meneley moved the court to dismiss the case against him on the basis of laches. The district court denied the motion.

In support of his argument that the doctrine of laches justifies the dismissal of the ouster action against him, Meneley notes that the claims of misconduct arose in 1995 and 1996. The KBI investigated the matters and filed no criminal or civil charges against him. He argues, therefore, that the State should have been precluded from pursuing the "stale" claims against him in the ouster action.

The doctrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as the neglect to assert a right or claim which, taken together with

the lapse of time and other circumstances causing prejudice to the adverse party, operates as a bar in a court of equity. Laches is the neglect or omission to assert a right that, taken in conjunction with lapse of time and other circumstances, causes prejudice to an adverse party. *Capitol Fed'l Savings & Loan Ass'n v. Glenwood Manor, Inc.*, 235 Kan. 935, 938, 686 P.2d 853 (1984). In order to invoke the doctrine of laches, the moving party must show that it has been prejudiced or put at disadvantage by the delay. See *Clark v. Chipman*, 212 Kan. 259, 269, 510 P.2d 1257 (1973); *Calkin v. Hudson*, 156 Kan. 308, 318, 133 P.2d 177 (1943). Meneley has not shown that he was prejudiced by the delay in filing the ouster action.

The doctrine of laches, furthermore, does not apply when a cause of action is brought by the State seeking to protect the public. See *Shriver v. Board of County Commissioners*, 189 Kan. 548, 556, 370 P.2d 124 (1962) (noting that the State is not subject to the defense of estoppel in matters relating to the public welfare); *City of Hutchinson v. White*, 117 Kan. 622, 625, 233 Pac. 508 (1925) (State cannot be estopped from protecting the public welfare even though officers "may have been lax in protecting" the rights of citizens). See also *Mohave County v. Mohave-Kingman Estates*, 120 Ariz. 417, 421, 586 P.2d 978 (1978) (although doctrine of laches may apply to proprietary acts of the State, it does not apply when the State is acting in sovereign capacity); *Central Collection v. DLD*, 112 Md. App. 502, 508, 685 A.2d 873 (1996) (doctrine of laches does not apply to the State when it sues in its sovereign capacity in its own courts); *Jennings v. Director of Revenue*, 9 S.W.3d 699, 700 (Mo. App. 2000) (refusing to allow appellant to invoke doctrine of laches against State when State acted in governmental capacity); and *Bd. of Pharmacy v. Frantz*, 51 Ohio St. 3d 143, 145-46, 555 N.E.2d 630 (1990) (noting that it is "well settled" that estoppel does not apply against a State when it is performing a governmental function).

Having already noted that the quo warranto action is a governmental function and not a propriety function, we hold the district court did not err in denying Meneley's motion to dismiss on the basis of laches.

## XIII. PRIOR TERM RULE

Meneley argues that the district court erred in denying his motion to dismiss based on the "prior term" rule.

Prior to trial, Meneley filed a motion to dismiss five counts of the petition on the grounds that the prior term rule applied. The motion was denied.

Meneley argues that because some of the acts complained of in the quo warranto petition occurred during his first term in office, they should be dismissed as he was elected to a second term by an "informed electorate."

The prior term rule is a common-law rule which generally prohibits a public officer from being removed from office for misconduct occurring during a previous term of the office. In *State, ex rel., v. Schroeder*, 199 Kan. 403, 414, 430 P.2d 315 (1967), this court discussed the rationale behind the prior term rule, stating:

"[T]he principal rationale of the rule is that reelection or reappointment of the officer amounts to condonation of his prior misconduct. Condonation of an offense implies knowledge of the offense, and, if the officer's misconduct in the prior term was concealed or not known to the electorate or the appointing official at the time of reelection or reappointment, several courts have refused to apply the rule. [Citations omitted.]"

Whether a court applies the prior term rule is often dictated by language in the quo warranto statutes. The quo warranto statutes in Kansas found at K.S.A. 60-1201 *et. seq.*, however, do not indicate one way or another whether the misconduct must occur in the officer's present term. This court has applied the prior term rule in the past. See *State, ex rel., v. Henschel*, 103 Kan. 511, 512, 175 Pac. 393 (1918) (applying prior term rule to reverse trial court's order removing chief of police from office for misconduct which occurred in previous term).

The prior term rule should not be applied where (1) the officer steadfastly denied any wrongdoing; (2) the officer had a continuing duty to make restitution; or (3) the officer has an important and vital societal role. See *In re Rome*, 218 Kan. 198, 203-04, 542 P.2d 676 (1975) (refusing to apply the prior term rule to judge because of his role in the judicial system); *Schroeder*, 199 Kan. at 414 (re-

fusing to apply prior term rule where county commissioner "stoutly denied" any wrongdoing from acts occurring in his first term); *State, ex rel., v. Harvey*, 148 Kan. 166, 172, 80 P.2d 1095 (1938) (county clerk had continuing duty to make restitution for missing funds which precluded application of the prior term rule).

In the present case, the prior term rule does not apply (1) because Meneley denied that he committed any wrongs; and (2) because of his role as sheriff. His duties as sheriff are an important and vital part of the criminal justice system and, as such, it would be inappropriate, based on the facts of this case, to apply the prior term rule.

The district court did not err in denying Meneley's motion to dismiss based on the prior term rule.

## XIV. STANDARD CONCERNING KNOWLEDGE OF OBLANDER'S DRUG ADDICTION

Meneley's last argument is that the district court erred by merely finding that Meneley "knew or should have known" about Oblander's drug use. This argument is without merit.

The order entered by the district court plainly states that the court found that Meneley knew of Oblander's drug use and that the court did not use the "should have known" standard. The court stated:

"Based on the foregoing findings of fact, the Court finds the following allegations to be true by clear and convincing evidence, and further concludes that said acts constitute willful misconduct as contemplated in K.S.A. 60-1205(1):

"a. During the 1996 investigation of the Shawnee County Sheriff's Department by the Kansas Bureau of Investigation and during the Attorney General's 1996 inquisition, Defendant Meneley knowingly and willfully concealed evidence of Deputy Oblander's theft of drug evidence from the Sheriff's Department.

"b. On or about April 11, 1996, Defendant Meneley willingly gave false testimony under oath before an Attorney General's inquisition by denying his knowledge of illegal drug use and treatment for drug addiction of Deputy Oblander.

"c. On March 9, 1999, Defendant Meneley willfully gave false testimony under oath before District Court Judge Eric Rosen in Shawnee County, Kansas, during the *Hernandez* hearing by denying that he had any

knowledge regarding illegal drug use and treatment for drug addiction of Deputy Oblander."

The district court did not apply the wrong standard in making its findings of fact or conclusions of law.

Affirmed.