NOT DESIGNATED FOR PUBLICATION

No. 122,147

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

JOHN THOMAS LASK,
*Appellant*,

and

KATHRYN ULRICH LASK,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVEN M.P. O'GRADY, judge. Opinion filed October 2, 2020. Affirmed.

*Michaela Shelton*, of Shelton Law Office, P.A., of Overland Park, for appellant.

*Joseph W. Booth*, of Lenexa, for appellee.

Before WARNER, P.J., STANDRIDGE and GARDNER, JJ.

PER CURIAM: Following the parties' divorce, the district court ordered John Thomas Lask (Thomas) to pay monthly child support to Kathryn Ulrich Lask (Kathryn), of which Kathryn was required to set aside $2,000 each month in trust for the benefit of the children. Thomas was also obligated to pay 89% of the children's uninsured medical expenses. After Kathryn sought reimbursement from Thomas for his share of certain uninsured medical expenses, the district court entered a judgment against Thomas in the amount of $96,299.92. On appeal, Thomas argues the district court's judgment is erroneous because: (1) many of the expenses did not qualify as necessary medical

1

expenses that were eligible for reimbursement, (2) he was not liable for the expenses that did qualify as necessary medical expenses due to Kathryn's unreasonable delay in requesting reimbursement, and (3) the court should have entered judgment in his favor for Kathryn's unaccounted-for trust funds.

FACTS

Thomas and Kathryn divorced in 2002 after nearly 10 years of marriage. At the time of the divorce, they had two children. M.E.L. was born in 1997 and N.L. was born in 2000. In the divorce decree, the district court incorporated the parties' separation agreement in setting forth orders regarding custody and support of the children. Under the terms of the separation agreement, Thomas was ordered to pay child support to Kathryn in the amount of $660 per month. The agreement further provided that Thomas and Kathryn were to share equally in the cost for all uninsured medical and other health care expenses incurred by or on behalf of the children. The parties also agreed to share equally in the cost for the children's college expenses, which were limited to the then-costs at the University of Kansas in Lawrence.

Following their divorce, Thomas and Kathryn briefly reconciled and a third child, M.D.L., was born in 2003. Thomas' child support obligation did not increase until October 2007, when the district court granted Kathryn's motion to modify the amount of child support to $888 per month.

In April 2009, the district court entered new orders in response to motions filed by both parties seeking to modify the previous child support orders. Given changes to the parties' parenting schedule, the termination of the parties' shared expense plan, and an increase in Thomas' annual income, the court found a substantial change in circumstances required a modification of child support. Thomas' income had increased to approximately $700,000. If calculated without using the extended income formula on the child support

2

worksheet, Thomas would be obligated to pay $3,159 in monthly support. If calculated using the extended income formula to calculate the amount, Thomas would be required to pay $8,198 in monthly support. Rather than applying the extended income formula, the court used the $3,159 amount as a starting point for the child support award but, based on the parties' overall financial condition, determined that the amount should be increased by $2,000 per month. The court ordered:

> "That the sum of $2,000 from the child support received by [Kathryn] from [Thomas] shall be held in trust for the benefit of the minor children and invested in a reasonable investment such as a money market or mutual fund at the discretion of [Kathryn]; that [Kathryn] shall be the trustee and is obligated to file an annual accounting of the trust with [Thomas] by providing actual financial institution records, cancelled checks, and receipts by January 22 of each calendar year; that [Kathryn] cannot spend more than 50% of the annual receipts into the trust unless there is agreement between the parties or permission of the Court to spend more."

The district court also ruled that the parties would no longer share equally in the children's uninsured medical expenses:

> "The parties will share in the payment of the parties' minor children's non-insurance-covered medical, dental, orthodontic, optical, psychological, psychiatric, and other similar items which shall be shared in the ratio set forth in line D.2 of the child support worksheet:  currently []11% by [Kathryn] and 89% by [Thomas]."

In addition, the court issued a series of temporary orders that included a provision granting the parties joint legal custody of the children but granting Kathryn "the sole responsibility for making health, education and daycare decisions on behalf of the children." This provision was in effect during all times relevant to this appeal.

In July 2014, Thomas moved to modify his previous parenting schedule based on M.E.L.'s desire to reside with him approximately 50% of the time. Kathryn opposed

Thomas' motion to modify the parenting schedule and filed a countermotion requesting modification of child support due to the children's ages and Thomas' increased income.

After M.E.L. reached the age of majority, the monthly child support order was proportionally reduced to $3,449.34, effective July 1, 2015.

In December 2015, Kathryn moved the court to hold Thomas in contempt. In an attached affidavit, Kathryn alleged that through May 31, 2015, she had incurred $35,138.77 in uninsured medical or other health expenses for the children and that Thomas had failed to reimburse her for his 89% proportionate share of these costs ($31,273.50). Kathryn also alleged that in the six-month period from June 1, 2015, through December 16, 2015, she had incurred around $96,000 in uninsured medical or other health expenses for the children. Although Thomas had not yet refused to pay his share of these costs (approximately $85,440), Kathryn believed that he would refuse to do so given his previous refusal to pay her and his statement that he would only discuss the situation through the parties' attorneys. Kathryn also asserted that she had spent $14,418.16 on M.E.L.'s college expenses and that Thomas had refused to pay his equal share ($7,209.08). Kathryn included a spreadsheet of her claimed expenses from 2009 through 2015.

In his responsive pleading, Thomas disputed most of Kathryn's claims. Specifically, Thomas argued that after the district court terminated the parties' shared expense plan in 2009, he had no duty to pay for any nonmedical expenses for which Kathryn sought reimbursement, including airfare, chiropractic bills, and what he described as boarding school tuition for N.L. Thomas argued that Kathryn should have paid these expenses from the monthly child support funds the court had ordered her to set aside in trust. As for actual medical expenses, Thomas claimed that Kathryn's request for reimbursement was untimely given her unreasonable delay in pursuing reimbursement. Thomas also suggested that Kathryn, who had sole authority to make medical decisions

4

for the children, often selected providers who were not approved for insurance reimbursement. Finally, Thomas argued that Kathryn was required to pay for her share of the children's college expenses out of the trust funds and that she had failed to provide him with proper documentation of these expenses.

The same day he filed his responsive pleading, Thomas filed two additional pleadings. First, Thomas moved to stay child support for N.L., claiming he had not resided with Kathryn since August 2015 and was unlikely to return in the near future because he had been in custody of juvenile authorities and was attending out-of-state boarding schools. Second, Thomas filed a motion to remove Kathryn as trustee of the children's trust account, alleging that she was unable to properly manage the account and had failed to file or provide him with an annual accounting of the trust.

The district court appointed a Special Master under K.S.A. 2019 Supp. 60-253 to resolve the parties' disputes regarding claims for reimbursement. After reviewing a large set of documents and filing multiple reports, the Special Master submitted a report dated September 18, 2018, concluding that Kathryn's claim amounted to $159,369.49 in various out-of-pocket expenses, along with $16,905.47 that she had not yet paid for N.L.'s "behavioral facilities."

Thomas responded with a motion to show cause seeking to hold Kathryn in contempt for breaching her duty as trustee of the children's trust. Thomas asserted that Kathryn had failed to file an annual accounting of the trust, she regularly comingled the funds with her personal checking account, she did not establish a separate trust account until April 2012, and she spent funds without his agreement or a court order. Thomas sought an accounting of all the trust funds. He also alleged that these funds were meant to help Kathryn pay for her share of the children's college expenses. Thomas claimed that N.L., who had dropped out of high school, would not be attending college. As a result,

5

Thomas asked the court to return the funds he had paid for Kathryn's share of N.L.'s college expenses to avoid her unjust enrichment.

In a separate motion, Thomas sought to have Kathryn's requests for reimbursement procedurally barred due to her failure to submit the requests to him within a reasonable time. Thomas also asked the court to order that any future requests for medical expenses were waived unless submitted within 30 days of incurring an expense.

In January 2019, the district court entered rulings on some of the parties' pending motions. This order is not at issue in the present appeal. Highly summarized, the court (1) retroactively modified the parties' child support award, (2) denied as moot Thomas' motion for stay of child support due to N.L.'s emancipation, (3) denied as moot Thomas' motion to remove Kathryn as trustee of the children's trust funds because the trust funds had been exhausted and the new support orders did not provide for a trust, (4) denied Kathryn's request for a special needs adjustment for M.D.L.'s future expenses, and (5) set forth time limits for medical expense reimbursement requests and payment.

In June 2019, the district court held an evidentiary hearing on the parties' remaining motions, including their competing contempt motions and Thomas' motion challenging Kathryn's request for medical expense reimbursement. At the hearing, the court heard testimony from Kathryn and Thomas.

*Kathryn's testimony*

Kathryn testified that most of the medical expenses for which she sought reimbursement were for N.L., who was diagnosed at an early age with attention deficit hyperactivity disorder, Asperger's Disorder, and disruptive behavior disorder. Despite therapeutic intervention and treatment, N.L.'s social, emotional, and behavioral issues continued to escalate, and he began expressing suicidal ideations. In 2014, Thomas and

N.L. were involved in a physical altercation that led to intervention by the Kansas Department for Children and Families.

N.L.'s therapist later advised that N.L. probably would need to live outside the home. Seeking to avoid an out-of-home placement, Kathryn enrolled N.L. in Outward Bound Intercept, a therapeutic intervention experience in Florida. Thomas did not object. Upon N.L.'s return, he continued to require ongoing counseling and other therapy. Thomas suggested sending him to military school, but Kathryn did not see this as an option because of N.L.'s academic record and medical diagnoses.

From October 2014 to August 2015, N.L. continually engaged in high-risk behavior by sneaking out in the middle of the night, getting into cars with people he met on social media, and using drugs. As a result, Kathryn began researching programs and, following discussion with Thomas, tried to determine whether long-term therapeutic care was covered by their insurance providers. Although Thomas did not always agree with Kathryn about where to place N.L., they both agreed that he could not live at home and required 24-hour care at a therapeutic behavioral residential treatment center. From August 2015 through August 2016, and again from October 2016 through February 2017, N.L. was in out-of-home placement in these locations:

- Promise Village in Davis, Michigan (6 days)
- White River Academy in Delta, Utah (30 days)
- Evoke Cascades in Bend, Oregon (12 weeks)
- Boulder Creek Academy in Bonners Ferry, Idaho (6 weeks)
- Caribou Ridge Intervention in Idaho (2 weeks)
- Viewpoint Psychiatric Hospital in Utah (30 days)
- Shelterwood Christian Academy in Independence, Missouri (5 months)
- TLC in Olathe, Kansas (5 days)

7

- Shelterwood Christian Academy in Independence, Missouri (5 months).

Beginning with his time at Promise Village, N.L. started a pattern of running away from the facilities and engaging in criminal activity and placing himself in physical danger. Twice, N.L. stole cars after he escaped and in one instance, jumped on a train. On another occasion, he could not be located for 36 hours. Each time N.L. ran away, Kathryn had to quickly locate a new facility for him, and she incurred travel expenses associated with his transport. As this pattern continued, it became harder to locate a suitable facility for N.L.

Kathryn testified that she submitted both her own and Thomas' insurance cards to each facility but that she did not have time to find out in advance whether their insurance providers would cover N.L.'s care. Kathryn claimed that although the facilities gave assurances that there would be some level of insurance coverage, none was ultimately offered for any of them. Kathryn paid all the expenses at each facility excluding N.L.'s second stay at Shelterwood Christian Academy, which was paid for by Thomas. Kathryn testified that she always discussed her plans for N.L. with Thomas before making a final decision. Thomas did not always agree with Kathryn's plans and only agreed to pay for half of the associated costs, denying that they constituted medical expenses for which he needed to pay a proportionate 89% share.

Kathryn admitted that she had not provided an annual accounting of the trust funds. According to Kathryn, Thomas had indicated that he was not worried about the daily ins and outs of the account so long as she could pay her share of the children's expenses. Kathryn testified that Thomas' monthly child support checks went into her personal account and that she did not initially place any of the funds into a separate trust account. Kathryn said that she did not distinguish child support from the trust funds and that as far as she was concerned, it was all child support. Kathryn did open a separate bank account for the trust in 2012 in which she deposited $1,000 each month. Kathryn

8

admitted that she did not always monitor which account she used for the children's expenses. She often paid credit card expenses out of her personal account and then transferred funds from the trust account to cover the expenses. Kathryn testified that over the years, she had invested in her house and other real estate for the children's behalf.

*Thomas' testimony*

Thomas agreed that N.L. had psychological disorders that required treatment, that he could not live at home, and that there were few out-of-home placement options. Thomas said that when he and Kathryn discussed the available options, he did not agree with Kathryn's decisions because they were usually expensive. When asked what Kathryn could have done differently, Thomas suggested that they could have shown N.L. "tough love" by letting him "sit in the [criminal justice] system for a short time to straighten him out." Thomas stated that his opinion ultimately did not matter, however, because the court had given Kathryn authority over these decisions. Thomas conceded that Kathryn made decisions, including those related to N.L.'s treatment, that were in the children's best interests.

Thomas believed that the residential facilities where N.L. stayed only provided a couple of hours of therapy per week. And because the facilities had not been recommended by a doctor, Thomas alleged that they did not constitute an uninsured medical cost for which he was obligated to pay 89% of the expenses. Thomas testified that Kathryn had rejected his offer to pay for half of the expenses and thought that she should have used the trust funds to pay them. Thomas also claimed that Kathryn was supposed to use half of the trust funds to pay for college and that he had never given approval to spend the other half of the funds. Thomas alleged that Kathryn should pay him back for any of the nondiscretionary trust funds that she could not account for.

While conceding that the district court's 2009 order had no deadline for the parties to request reimbursement for medical expenses, Thomas claimed that Kathryn's failure to notify him within six months of incurring the expenses prevented him from submitting claims to his insurance company. Thomas assumed that if he had been able to do so, the cost of some of the expenses would have been reduced. But Thomas could not recall his specific coverage and did not provide any evidence that his insurance would have covered any specific expenses.

After considering the above testimony, evidentiary exhibits, and argument from counsel, the district court entered a written ruling on the parties' motions. The court's relevant rulings are summarized as follows:

- The court determined that neither party should be held in contempt. Despite finding that Kathryn had failed to properly account for the trust funds, the court ruled there was no current remedy to coerce Kathryn to follow the orders relating to the trust funds.
- The court found that Kathryn had sole discretion to make medical decisions for the children and that the decisions she made were not unreasonable. The court noted that Thomas had not asked for the court to review these decisions or modify its prior order giving Kathryn legal decision-making authority.
- The court determined that the 2009 order modifying child support replaced and superseded the parties' original settlement agreement and provided coverage for "'all necessary medical expenses . . . not covered by insurance.'"
- The court held that mental health expenses constituted medical expenses that were eligible for reimbursement. These mental health expenses included N.L.'s stay at the residential facilities other than Outward Bound and Promise Village, reasonable costs associated with travel to these facilities, hypnotherapy, chiropractic services, and other counseling and therapy services.

10

- The court rejected Thomas' argument that Kathryn's requests for reimbursement were unreasonably late or otherwise barred by the doctrine of laches.

- The court held that Kathryn was granted wide discretion in managing the trust funds, that she did not have to create a trust account or formal trust, and that use of the funds was not restricted only to college expenses. But Kathryn had failed to provide an annual accounting of the funds and did not obtain Thomas' permission before spending the nondiscretionary half of the funds. The court concluded, however, that Kathryn did not breach any duty to the trust beneficiaries because she appeared to have used the trust funds for the children's medical needs and spent more on medical expenses annually than the nondiscretionary funds would have covered.

- The court ruled that under the separation agreement, each party was responsible for 50% of the children's college expenses. The court found that Kathryn had not contributed her share of M.E.L.'s college expenses because she had used most of her available funds for N.L.'s medical care and that Thomas had paid most of M.E.L.'s college expenses. The court rejected Thomas' claim that the trust money was his contribution to college expenses and held that the 2009 child support order did not replace his obligation to fund half of the children's college expenses.

- After deducting Kathryn's share of college expenses and her proportional share of N.L.'s second stay at Shelterwood Christian Academy, the district court held that Kathryn was entitled to a judgment against Thomas in the amount of $96,299.92. Given Kathryn's delays in requesting reimbursement and her failure to segregate the trust funds or provide an annual trust accounting, the district court stayed execution on the judgment and ruled that no interest would accrue so long as Thomas made timely payments.

Thomas filed this timely appeal.

11

ANALYSIS

Thomas argues that the district court erred in determining that he was liable to Kathryn for uninsured medical expenses, claiming that the judgment is contrary to the Kansas Child Support Guidelines (Guidelines) and constitutes an impermissible retroactive increase of child support.

A district court's child support award is generally reviewed for abuse of discretion. *In re Marriage of Skoczek*, 51 Kan. App. 2d 606, 607, 351 P.3d 1287 (2015). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). When reviewing a district court's child support order, we also consider whether the order was supported by substantial competent evidence. *In re Marriage of Brand*, 273 Kan. 346, 350, 44 P.3d 321 (2002). In doing so, we will not reweigh conflicting evidence, redetermine witness credibility, or redecide questions of fact. *In re Marriage of Skoczek*, 51 Kan. App. 2d at 608. "'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.'" *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014).

Parental child support obligations in a divorce action are governed by statute and guidelines established by our Supreme Court. See K.S.A. 2019 Supp. 23-3001 et seq. (governing court's obligation and authority to make provisions for child support); K.S.A. 2019 Supp. 20-165 (mandating Supreme Court to adopt rules establishing child support guidelines); Guidelines, Administrative Order No. 307 (2020 Kan. S. Ct. R. 93). As directed by our Legislature in K.S.A. 2019 Supp. 20-165, the Kansas Supreme Court has established guidelines that govern how a district court must generally calculate the amount of child support due. The guidelines include schedules adopted by our Supreme Court that take into account various data regarding income and expenditures to aid in

12

properly assessing the nature of the income and expenditures involved in calculating child support. See, e.g., Guidelines, § II.B. and C. (2020 Kan. S. Ct. R. 94); § IV (2020 Kan. S. Ct. R. 108).

As part of the district court's authority to determine child support, the court has authority to determine how the parties will pay their children's medical expenses. See Guidelines, § IV.D.4.b. (2020 Kan. S. Ct. R. 111); *In re Marriage of White*, No. 118,050, 2018 WL 3077086, at *2 (Kan. App. 2018) (unpublished opinion). Under the Guidelines, medical expenses not covered by insurance are generally divided based on each parent's percentage of the parties' total income. Guidelines, § IV.D.4.b.

Here, the district court's 2009 child support order provided that Thomas was responsible for 89% of the children's "non-insurance-covered medical, dental, orthodontic, optical, psychological, psychiatric, and other similar" expenses, while Kathryn was responsible for the remaining 11%.

In challenging the judgment entered against him, Thomas argues that (1) many of the claimed expenses did not qualify as necessary medical expenses that were eligible for reimbursement, (2) he was not liable for the expenses that did qualify as necessary medical expenses due to Kathryn's unreasonable delay in requesting reimbursement, and (3) the court should have entered judgment in his favor for Kathryn's unaccounted-for trust funds.

1. *Necessary medical expenses*

Thomas challenges most of the expenses for which the district court ordered reimbursement as "exorbitant, non-prescription items" that Kathryn incurred without his agreement or the court's approval. While conceding that Kathryn had sole responsibility for making medical decisions on behalf of the children, he claims that many of the

expenses did not qualify as necessary medical expenses that were eligible for reimbursement. Thomas argues that uninsured medical expenses are limited to "co-pays and relatively minor certain medical costs" that remain after insurance pays the bulk of the expense or costs from a procedure prescribed by a licensed physician and are not defined by a parent's subjective interpretation of what is "medically necessary." Thomas specifically opposes the following expenses.

a. *N.L.'s residential treatment*

Thomas argues that the expenses for N.L.'s residential treatment facilities went beyond normal uninsured medical expenses. Rather than requesting reimbursement after incurring the expenses, Thomas contends that Kathryn instead should have requested that the district court find a material change in circumstances warranted modification of the child support worksheet to include a special needs adjustment.

Thomas' argument lacks merit for multiple reasons. Notably, his assertion that uninsured medical expenses are limited to minor costs remaining after insurance pays for most of the expenses or costs from a procedure prescribed by a licensed physician relies on language to that effect in the parties' 2002 separation agreement. This agreement provided:

> "MOTHER shall pay 50% and FATHER shall each pay 50% of the cost, expense or charges for any and all uninsured medical dental, orthodontic, endodontic, prescription, optical (including eye care, contacts and eyeglasses), psychiatric, psychological, nursing, counseling and other health care expenses incurred by or on behalf of the child, until they are no longer eligible for support, subject to the following limitations and subject to modification pursuant to Kansas law:
>> "1. 'Uninsured costs' means any expense remaining after payment by an insurance plan and/or carrier for a specific medical, dental, vision, orthodontic, prescription, and counseling procedure prescribed by a licensed health care professional.

14

"If a particular medical, dental, vision, orthodontic, prescription, and counseling procedure is for any reason a procedure which is not an insured procedure or expense, then the parties shall pay all costs of that treatment or prescription so long as the procedure or prescription is prescribed by a licensed health care professional.

"2. The parties shall pay the cost of counseling for the child, including counseling for the child in which both parents participate which the parties agree is a medical expense explicitly included as an expense to be paid by them regardless of whether or not it is an insured procedure, if agreed upon by both parents.

"3. The maximum cost shall, in any event, be limited to that amount charged by the provider, physician, or medical institution providing the services which is the ordinary and customary charge for the medical, dental, vision, orthodontic, prescription, or counseling services in the hospital or other medical facility where the procedure is performed. Any co-payment required by an insurance carrier shall be deemed an uninsured cost for purposes of this Agreement.

"The parent obtaining the non-covered care shall provide a copy of each bill, including co-payments to the other parent and submit covered expenses to the insurer for payment. Said bill shall be paid within 14 days of receipt of said bill, either by paying the medical provider or reimbursing the other parent."

Two major changes occurred in 2009 when the district court modified the parties' child support order due to a change in the parties' overall financial circumstances. First, rather than the parties sharing equally in the children's uninsured medical expenses, the court ordered them each to pay according to their proportional share of their joint income. To that end, the court ordered Thomas to pay 89% and Kathryn to pay 11% of the children's "non-insurance-covered medical, dental, orthodontic, optical, psychological, psychiatric, and other similar items." The court's 2009 order did not define uninsured costs or include the other limiting language found in the 2002 separation agreement. Second, the court granted Kathryn "the sole responsibility for making health, education and daycare decisions on behalf of the children." Therefore, when Kathryn incurred

15

expenses for N.L.'s residential treatment, she had sole authority to make medical decisions on his behalf. Given these modifications, Thomas' reliance on the 2002 separation agreement is misplaced.

Thomas' allegation that Kathryn should have requested a special needs adjustment to pay for N.L.'s residential treatment is equally unpersuasive. Special needs are described under the Guidelines as "items which exceed the usual and ordinary expenses incurred, such as ongoing treatment for health problems, orthodontist care, special education, or therapy costs, which are not considered elsewhere in the support order or in computations on the worksheet." Guidelines, § IV.E.4. (2020 Kan. S. Ct. R. 118). See *In re Marriage of Ronen*, 29 Kan. App. 2d 443, 445-46, 26 P.3d 1287 (2001) ("Special needs are items above and beyond the ordinary expenses of raising children and are only those expenses not considered elsewhere in the support order or on the computation worksheet . . . special needs are items that are not prevalent in the general population.").

Thomas suggests that the ongoing nature of N.L.'s residential treatment constituted a special need above and beyond an ordinary expense of raising children. He asserts that Kathryn should have sought a special needs adjustment because they did not have an agreement or order in place to manage that expense. Thomas argues that by incurring the expenses first and requesting reimbursement later, Kathryn eliminated his ability to provide input about less expensive options.

Kathryn incurred expenses for N.L.'s out-of-state residential treatment from August 2015 through February 2017. While such treatment may have qualified as a special need if either party had requested such an adjustment, Kathryn was certainly under no obligation to do so. And under the circumstances present here, it is understandable that she did not. N.L.'s therapist recommended out-of-home placement. Due to N.L.'s inability to remain in any facility for an extended period of time, Kathryn was often forced to decide on his next placement quickly, with as little as 24 hours'

16

notice. It is unrealistic to expect that Kathryn would or should have sought court intervention before making these time-sensitive and life-saving decisions.

Additionally, Thomas' suggestion that he lacked the ability to give his opinion about N.L.'s placement is contrary to the record. It is true that Kathryn had the sole discretion to make decisions about N.L.'s medical care, which included deciding where he would attend residential treatment. But she did not make these decisions without Thomas' knowledge or input. To the contrary, Kathryn testified that she was in regular communication with Thomas throughout N.L.'s time in and out of the different facilities. Even Thomas admitted that there were few available options given the circumstances. While Thomas may not have always agreed with Kathryn's decisions about N.L.'s treatment, it does not appear that he provided much, if any, assistance in offering viable alternatives.

Thomas relies on *In re Marriage of Blagg*, 13 Kan. App. 2d 530, 775 P.2d 190 (1989), and *In re Marriage of Ames*, No. 93,696, 2006 WL 90103 (Kan. App. 2006) (unpublished opinion), to support his argument that extraordinary medical expenses should be requested in advance and may not be retroactively awarded. But *Blagg* and *Ames* may be distinguished from the present case because the controlling order in those cases only obligated payment of a monthly amount of child support and contained no provision for reimbursement of medical expenses. *Blagg*, 13 Kan. App. 2d at 532-33; *Ames*, 2006 WL 90103, at *1. Here, Thomas was required to pay monthly child support *and* a proportionate share of the children's uninsured medical expenses. Thus, the district court's order requiring Thomas to reimburse Kathryn for uninsured medical expenses did not constitute an impermissible retroactive increase of child support.

Nevertheless, Thomas claims there should be a financial limit on uninsured medical costs to avoid "catastrophic" liability for "out-of-state therapeutic educational facilities as expensive as a college education." But the provision for uninsured medical

17

expenses has no financial limit. The Guidelines simply say that "the court shall provide that all necessary medical expenses . . . shall be assessed to the parties in accordance with the parties' proportional share" of their joint income. § IV.D.4.b. (2020 Kan. S. Ct. R. 111-12). A party's responsibility to reimburse uninsured medical expenses is limited not by cost but by medical necessity.

Substantial evidence supports the district court's finding that the expenses incurred for N.L.'s residential treatment were necessary and reasonable under the circumstances of this case. Kathryn testified at length about N.L.'s mental health diagnoses, his behavioral issues, and her genuine concern for his welfare. After N.L.'s therapist recommended out-of-home placement, Kathryn exhausted many options before moving N.L. out of her home. While Thomas may disagree with Kathryn's choices, he agreed that Nicolas could not live at home and required 24-hour care at a therapeutic behavioral residential treatment center. We cannot say that the expenses incurred for N.L.'s treatment were unnecessary.

Thomas also challenges the district court's order that he reimburse Kathryn for travel expenses associated with her transporting N.L. to and from the residential treatment facilities, including expenses for airfare, airport parking, baggage fees, car rentals, taxi service, hotels, and fees for shipping supplies to the facilities. Substantial evidence supports the district court's award of these expenses. Kathryn testified that these costs of travel, which included expenses for her to accompany N.L. on occasion, were necessary to get him to and from the facilities. It does not appear that Thomas ever accompanied N.L.

Thomas complains that the district court's order was inconsistent in finding certain expenses reimbursable while not allowing others. Thomas does not point to a specific expense but merely cites a single page of the district court's order. This page lists several miscellaneous expenses that the court found were not subject to reimbursement, including

three separate charges for shipping supplies to Promise Village and one charge for shipping supplies to Boulder Creek Academy. Presumably, the court found that the Promise Village shipping charges were not reimbursable based on its finding that Promise Village was not a mental health provider. It is unclear why the court did not allow for the Boulder Creek Academy shipping charge, as it allowed for reimbursement of other Boulder Creek Academy expenses. But even if the court erred in this regard, it was harmless because the error was in Thomas' favor.

b. *Ongoing therapy expenses*

Thomas argues that the children's ongoing therapy expenses do not constitute an ordinary medical expense and are instead a special need for which Kathryn should have requested modification of the child support award.

Nothing in the record suggests that the children's ongoing therapy is above and beyond a normal and necessary medical expense that would constitute a special need. There is substantial evidence in the record to support the district court's finding that the children's therapy expenses were medical expenses subject to reimbursement.

c. *Chiropractic expenses*

Thomas asserts that the children's chiropractic expenses are not reimbursable because they do not involve traditional medical care deemed medically necessary by a doctor.

Thomas' disagreement with the type of service provided does not render the expenses medically unnecessary. And Thomas provides no support for his claim that the chiropractic services were not recommended by a doctor. But even if they were not, the child support order contained no such requirement for an expense to qualify for

19

reimbursement. There is substantial evidence to support the district court's finding that the children's chiropractic expenses constituted medical expenses for which Kathryn was entitled to reimbursement.

### d. *Remuda Ranch*

Thomas lists M.E.L.'s stay at Remuda Ranch, a residential treatment center in Arizona, on the list of expenses he is challenging but provides no argument about this specific expense. As a result, Thomas has waived this argument. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (a point raised incidentally in a brief and not argued therein is deemed abandoned).

## 2. *Untimely request for reimbursement*

Thomas next objects to the district court's order that he was responsible for his proportional share of necessary medical expenses, including co-pays, doctor and emergency room visits, and prescriptions. Thomas agrees that while these items would typically be reimbursable as medical expenses, Kathryn's claim for reimbursement is barred by the doctrine of laches. We review the district court's application or denial of the doctrine of laches for abuse of discretion. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 388, 22 P.3d 124 (2001).

Our Supreme Court has explained the doctrine of laches as follows:

"The doctrine of laches is an equitable principle designed to bar stale claims. When a party neglects to assert a right or claim for an unreasonable and unexplained length of time, and the lapse of time and other circumstances cause prejudice to the adverse party, relief is denied on the grounds of laches. We have stated that the mere passage of time is not enough to allow a party to invoke the doctrine. For laches to apply, the court must consider the circumstances surrounding the delay and whether there was any

disadvantage to the other party caused by that delay. [Citation omitted.]" *Steele v. Guardianship & Conservatorship of Crist*, 251 Kan. 712, 725, 840 P.2d 1107 (1992).

Kathryn correctly points out that laches is an affirmative defense that is waived if not pled in a party's responsive pleading. K.S.A. 2019 Supp. 60-208(c); *In re Parentage of Shade*, 34 Kan. App. 2d 895, 903-04, 126 P.3d 445 (2006). She suggests that Thomas waived this defense by failing to specifically cite the doctrine below. But in his response to Kathryn's motion for contempt, Thomas argued that her request for reimbursement was untimely due to her unreasonable delay. The district court rejected this argument, making explicit reference to the doctrine of laches. The issue was properly raised and addressed below.

In Kansas, child support installment payments become final judgments once they are due, and they may be enforced and collected as any other judgment. *Summitt v. Summitt*, 31 Kan. App. 2d 812, 817, 74 P.3d 584 (2003). An order of medical expense reimbursement is akin to "a child support judgment that may be enforced when reimbursement is due and payable by its terms." *In re Marriage of Davis*, No. 99,707, 2008 WL 5401480, at *2 (Kan. App. 2008) (unpublished opinion).

Although there is caselaw in Kansas supporting the use of laches in child support cases, the doctrine has not been used to bar child support claims involving a minor child. See, e.g., *In re Parentage of Shade*, 34 Kan. App. 2d at 904 (noncustodial parent ordered to pay child support "may not invoke the defense of laches as a bar to the enforcement of moral and legal obligations to their minor children. The rights of the latter are not to be waived by the inaction and passive acquiescence on the part of the [custodial parent]"); *In re Marriage of Burton*, 29 Kan. App. 2d 449, 452-53, 28 P.3d 427 (2001) (doctrine of laches barred mother's claim to child support arrearage when she accepted support proffered by father for three years and child for whom support sought had reached age of majority); *In re Marriage of Jones*, 22 Kan. App. 2d 753, 756, 761, 921 P.2d 839 (1996)

(refusing to apply doctrine of laches to child support claim involving minor child despite 12-year filing delay).

The medical expenses Kathryn sought reimbursement for were incurred on behalf of the parties' minor children. Yet Thomas maintains that the doctrine of laches applies here because Kathryn failed to follow the procedure for medical expenses set forth in the parties' 2002 separation agreement, which required her to give him a copy of each bill before submitting it to the insurer, and instead waited several years to present the expenses to him. Thomas claims that he suffered prejudice as a result because he was unable to timely submit these claims to his insurance provider.

The circumstances of this case do not warrant application of the doctrine of laches. First, Thomas cannot rely on language from the parties' 2002 separation agreement. As discussed, when the district court modified the parties' child support award in 2009, the uninsured medical expenses provision no longer contained the language from the separation agreement that required the party seeking reimbursement to present medical bills to the other party before submitting them to the insurer. In 2019, the district court further modified the uninsured medical expenses provision to require the party seeking reimbursement to provide the other party proof of the expense and proof of payment within 30 days of paying the expense, but the 2009 order that was in effect when Kathryn incurred the medical expenses at issue contained no similar requirement.

Second, Kathryn's requests for reimbursement were not unreasonably late. Kathryn sought reimbursement for the children's medical expenses incurred from 2009 to 2018. Kathryn testified that she had discussions with Thomas about his need to cover his 89% share of the children's out-of-pocket medical expenses over the years but that she generally tried to avoid conflict and just wanted to get along. Kathryn said she did not think about the accounting each time she took the children to the doctor and was instead focused on taking care of them. According to Kathryn, she did not fully understand that

Thomas was not going to voluntarily pay his share of the medical expenses until M.E.L. was about to graduate from high school. So in June 2015, Kathryn sent Thomas all her receipts and paperwork to seek reimbursement for his share of the out-of-pocket medical expenses. Thomas responded that he would only discuss the topic with their attorneys. Kathryn then hired an accountant to create a summary of all the children's medical expenses and, after receiving no further response from Thomas, she filed her motion for contempt in December 2015. While Kathryn could have provided receipts to Thomas and requested reimbursement for certain expenses earlier, her delay in doing so was not unreasonable under the circumstances present here.

In any event, Thomas' claim of prejudice is not supported by the record. Thomas alleges that Kathryn's delay in requesting reimbursement for the children's medical expenses prevented him from timely submitting these claims to his insurance company. But Thomas cites no evidence for his assertion that his insurance provider would have paid for expenses that Kathryn's provider did not. Indeed, Thomas testified that although he did not recall the details of his insurance coverage and that he did not know what expenses his provider would have covered, he assumed that some of the costs would have been reduced. The burden is on the party making a claim to designate facts in the record to support that claim; without such a record, the claim of error fails. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013). Thomas has failed to designate facts in the record to support his speculative claim that he was prejudiced by Kathryn's alleged delay in requesting reimbursement for the children's medical expenses.

Because there is substantial evidence to support the district court's findings that Kathryn's delay in requesting reimbursement was not unreasonable and that Thomas had failed to establish prejudice as a result of any delay, the district court did not abuse its discretion in refusing to apply the doctrine of laches to bar Kathryn's claim for relief.

3. *Trust funds*

Finally, Thomas argues that the district court erred in declining to hold Kathryn responsible in any meaningful way for breaching her duties as trustee and failing to account for the children's trust funds. Thomas claims that principles of equity require the unaccounted-for funds to be returned to him to avoid Kathryn's unjust enrichment.

Because the district court refused to hold Kathryn in contempt for her failure to comply with the 2009 orders relating to the trust funds, the parties frame this issue as one to be determined under the rules of contempt. But Thomas does not specifically challenge the district court's contempt ruling. The relief he seeks is a credit against his judgment owed to Kathryn. Thomas is not entitled to this relief, however, because it would result in an impermissible retroactive modification of child support.

The parties agree that Kathryn did not follow the district court's 2009 orders that required her to set aside $2,000 of Thomas' monthly child support in trust for the children. Although the order did not require Kathryn to create a trust account or set up a formal trust, the language of the order reflected an intent that the funds be available for long-term use. Kathryn was not required to manage the funds in any particular way but was to make "reasonable investment" of the funds. Kathryn claimed that she invested trust funds into her house and other property but did not provide any real evidence tying any specific funds to these investments. Kathryn was required to provide an annual accounting of the trust to Thomas and to obtain permission from Thomas or the court before spending half of the funds. Kathryn did neither. Kathryn testified that she did not think of the trust funds as separate from the other child support funds and that she considered it all to be child support. Until she opened a separate bank account for the trust in 2012, Kathryn did not keep the child support or trust funds separate from her personal account and she paid for personal expenses out of the same account that contained the trust funds. Kathryn admitted that she sometimes paid credit card expenses

24

from her personal account and would then transfer money from the trust account to her personal account. But Kathryn denied ever using child support money for personal use.

Without support, Thomas calculates a hypothetical amount of trust funds he believes should have accumulated over the years and suggests that he is entitled to any amount for which Kathryn cannot prove that she spent on the children's behalf.

But Thomas' logic is flawed because it fails to consider that the $2,000 monthly trust funds were part of the overall child support award that he was ordered to pay. To require Kathryn to reimburse Thomas for any of this amount would result in an improper retroactive modification of child support. Under K.S.A. 2019 Supp. 23-3005(b), a child support modification can only be retroactive to a date at least one month after a motion to modify is filed. Thomas never moved to modify child support based on Kathryn's management of the trust funds. Thus, the relief he seeks is unavailable.

Additionally, Thomas' argument ignores his part in contributing to Kathryn's financial difficulties. Thomas was ordered to pay monthly child support, of which $2,000 was to be set aside in trust for the children. By all accounts, Thomas paid child support every month. But Thomas was also ordered to pay for his proportionate share of the children's uninsured medical expenses. Thomas did not pay for these expenses. Without considering other direct and indirect expenses associated with raising children, the record reflects that Kathryn had spent over $158,000 on out-of-pocket medical expenses and more than $17,000 on M.E.L.'s college expenses during the relevant time period. As a result, it is no surprise that Kathryn would use the trust funds—that were part of the monthly child support award—to help cover these expenses. Thomas appears to concede that Kathryn may have used the trust funds to pay for N.L.'s "extraordinary expenses." Kathryn's lack of accounting for the trust funds is irrelevant given the actual expenses that she paid are more than the amount for which Thomas seeks an accounting. Thomas' claim of unjust enrichment is unfounded.

For all these reasons, the district court properly entered judgment against Thomas in the amount of $96,299.92.

4. *Appellate attorney fees*

After oral argument, Kathryn filed a motion and affidavit for appellate attorney fees in the amount of $15,840. Her request for attorney fees was made under Supreme Court Rule 7.07(b)(1) (2020 Kan. S. Ct. R. 50), which allows this court to award attorney fees for services on appeal in a case where the district court had the authority to award attorney fees. In a family law case, the district court may award attorney fees to either party "as justice and equity require." K.S.A. 2019 Supp. 23-2715. Since the district court had authority to grant attorney fees, this court has authority to award attorney fees for services on appeal.

Kathryn's motion specifies that her attorney and his paralegal spent 42.1 hours working on this appeal, with the attorney billing at an hourly rate of $400 and the paralegal billing at an hourly rate of $150. The motion is appropriately itemized and documented. In response to the motion, Thomas asserts that he should not have to pay Kathryn's fees on appeal because "[i]t would be unjust and inequitable for [Kathryn] to be awarded attorney fees on this appeal considering the nature of the issues before this court." But contrary to Thomas' assertion, the equities related to the "the nature of the issues before this court" weigh in favor of awarding Kathryn the appellate attorney fees she incurred in defending this appeal. Thomas' failure to reimburse Kathryn for his share of the children's reasonable and necessary, but uninsured, medical expenses is what generated the litigation in the district court. And rather than accept the district court's ruling and expeditiously reimburse Kathryn as ordered, which would have been in the best interests of both parties, he prolonged the litigation by taking this appeal. Based on our decision here that Thomas failed to properly reimburse Kathryn for his share of the

26

uninsured medical expenses, justice and equity compel us to conclude that he now stands responsible for the costs incurred by Kathryn in defending this appeal.

Having found Kathryn is entitled to appellate attorney fees, we now must decide whether the amount requested is reasonable. Under KRPC 1.5(a) (2020 Kan. S. Ct. R. 297), we must evaluate the reasonableness of the amount of attorney fees requested by considering eight factors. We do so below.

a. *The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly*

Appellate counsel was hired based on his experience as an appellate attorney practicing solely in the area of family law. Appellate counsel was not the attorney who tried the matter before the district court. This meant appellate counsel was required at the outset to spend time reviewing the record, briefs, and motions filed with the district court. After getting up to speed with the case, appellate counsel's billing records reflect that he reviewed Thomas' 38-page brief, conducted research, drafted Kathryn's 35-page response brief, reviewed Thomas' 14-page reply brief, and then prepared for and participated in oral argument.

b. *The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer*

Appellate counsel states his practice is full time, and he regularly must turn away business because of scheduling.

c. *The fee customarily charged in the locality for similar legal services*

Appellate counsel states his fee is customarily $400 per hour with $150 an hour for his paralegal's time. Counsel further states that his hourly fee and the hourly fee for

27

his paralegal is similar to those charged by attorneys focusing on family law issues in the Johnson County Court and nearby areas.

d. *The amount involved and the results obtained*

Thomas sought to be relieved from a judgment in excess of $96,299.92 as well as some undesignated amount in refund of child support he already paid. Kathryn was the prevailing party on all claims.

e. *The time limitations imposed by the client or by the circumstances*

The circumstances required appellate counsel to file Kathryn's brief within 30 days after receiving Thomas' brief. Appellate counsel states he filed a timely response brief and did not request additional time to do so because a delay would have been costly to his client.

f. *The nature and length of the professional relationship with the client*

As noted above, appellate counsel was retained for this appeal and did not represent Kathryn in proceedings before the district court.

g. *The experience, reputation, and ability of the attorney performing the services*

Appellate counsel states he has a practice that includes a significant amount of appellate work in Kansas, as well as other jurisdictions, and has focused primarily on family law issues since 1998. Appellate counsel further states that many of the appeals are filed under his name but that he does act as a consultant and assistant in drafting appellate briefs that are filed under the names of other attorneys. Appellate counsel was the liaison between the American Bar Association and the Uniform Law Commission (formerly NCCUSL) to the drafting of the Uniform Interstate Family Support Act (2001

and 2008 versions). Counsel is the co-chair of the ABA Family Law Section Publications Board and sits on the ABA Family Law Section Counsel. He also is a Fellow in the American Academy of Matrimonial Lawyers, a Fellow of the International Academy of Family Lawyers, has served in the past as a judge pro tem for the Johnson County District Court, and teaches family law issues as an Adjunct Professor for Washburn University School of Law.

h. *Whether the fee is fixed or contingent*

Fees were hourly and appellate counsel charged $400 per hour for the time spent on this appeal and $150 an hour for his paralegal's time.

In evaluating the requisite factors set forth above, we find the $15,840 requested by Kathryn for appellate attorney fees is reasonable. In the interest of equity and justice, we award $15,840 in appellate attorney fees in favor of Kathryn and against Thomas.

Affirmed.